[Civ. No. 11350. Second Appellate District, Division One.—February 7, 1938.]

LOS ANGELES COUNTY FLOOD CONTROL DISTRICT (a Body Corporate and Politic), Appellant, v. J. R. ABBOT, Jr., et al., Defendants; LEOTA ALLEN CARROLL et al., Respondents.

730

Everett W. Mattoon and G. H. O'Connor, County Counsel, and Fred M. Cross and S. V. O. Prichard, Deputies County Counsel, for Appellant.

John M. Dvorin, Holbrook, Taylor, Tarr & Reed and Leslie R. Tarr for Respondents.

WHITE, J.—This is an appeal by plaintiff from a judgment of the Superior Court of Los Angeles County awarding damages to defendants Jacob H. Yonker, Kathryn L. Yonker and Leota Allen Carroll, as owners of real property, in an eminent domain proceeding instituted by Los Angeles County Flood Control District, which district sought to acquire an easement over said property for the construction of a flood control channel to confine and carry the waters of what is known as Alhambra wash. Following commencement of the action, on March 10, 1936, a sum fixed by the court was deposited by plaintiff district for immediate possession, whereupon the trial court ordered such immediate possession of all parcels in the proceeding, including those here involved.

The trial as to both the Yonker and Carroll parcels with which we are here concerned was consolidated by order of the trial court and heard before the same judge and jury. A verdict was returned by the jury awarding defendants Yonker $1335 for the value of their parcels of land taken and $24,140 as severance damages, while defendant Carroll was by the verdict awarded $100 for her parcel of land taken and $3,000 as severance damages. Findings of fact, conclusions of law and interlocutory judgment of condemnation having been signed and filed by the court in accordance with the verdict, and the Flood Control District's motion for a new trial having been denied, the latter prosecutes this appeal.

The lands of respondents Yonker consist of about 15½ acres, of which appellant Flood Control District sought to take approximately 3.06 acres. It appears that during the rainy season a considerable supply of sand and gravel was washed down by the normal flow of waters upon respondents Yonker's property. Upon this land respondents Yonker had constructed bunkers on the northerly bank of the stream. Following each rainy season and after the bed had dried,

respondents Yonker would scrape up the rock, sand and gravel so deposited on their lands, sift it through their bunkers to take out the glass, tin cans and junk, and then sell it commercially as building material. The construction of this improvement sought to be installed by appellant Flood Control District in the form of a permanent concrete channel or flume, with a concrete floor approximately 40 feet wide, and with concrete walls on each side approximately 14 feet high, would, of course, prevent the water from flowing across respondents Yonker's land, and consequently there would be no replenishment of rock, sand and gravel to be utilized as above set forth after the construction of the proposed improvement.

Appellant Flood Control District first assails the judgment given in favor of respondents Yonker on the ground that it is based on the erroneous theory that a property owner has a vested present right to receive future accretion from the waters of a seasonal wash or arroyo, and is entitled to be compensated in a condemnation proceeding for the construction of a flood control channel upon his land which prevents the deposit of such future accretions of rock, sand and gravel; and that the owner of lands, riparian to a seasonal wash or arroyo, has the right to claim a beneficial use or riparian right to have the waters of the stream deposit sand and rock upon his land for use by him in commercial sale; while respondents Yonker contend that appellant Flood Control District is neither an upper riparian owner nor appropriator of water, but a public body seeking to condemn a right of way for flood control purposes under the constitutional provision which requires that compensation be paid for taking or damaging of private property for public use; and respondents Yonker further contend that as riparian owners they had the right to receive the normal and natural flow of water in the Alhambra wash upon and through their lands; that the rights in the normal stream flow are "parcel" to the real estate. Respondents Yonker earnestly insist that there is no issue here involved as to their right to future annual deposits of rock, sand and gravel, contending that at the time of the taking and damaging of their property they were receiving upon their lands certain deposits of rock, sand and gravel held in suspension by the waters of the Alhambra wash; that no other riparian owner or

appropriator of water, nor anyone with rights superior to theirs was attempting to interfere with respondents' use of the stream flow of the Alhambra wash, nor had anyone so attempted to interfere with the use of the normal and natural flow during some 30 years that the sand and gravel plant had been in operation. Respondents Yonker concede the right of appellant Flood Control District, in the exercise of eminent domain, to acquire for a public purpose the easement sought to be condemned by these proceedings, but assert that as a condition to the acquisition of such an easement said district must pay not only for the property taken, but also for damages to the remainder.

We find ourselves in accord with the claims of respondents Yonker. That they were riparian owners cannot be questioned. The word "riparian" is defined as relating to the bank of a stream or other water—river, lake or sea. (Black's Law Dict.; Anderson's Law Dict.) The Latin word *"ripa"* means "shore of a river". (Anderson's Law Dict.; *Bathgate* v. *Irvine,* 126 Cal. 135, 143 [58 Pac. 442, 77 Am. St. Rep. 158].) "The rights of a riparian proprietor, so far as they relate to any natural stream, exist *jure naturae,* because his land has by nature the advantage of being washed by the stream." (Lord Seldon, in *Lyon* v. *Fishmongers Co.,* L. R. 1 App. Cas. 662.)

We are not here dealing with flood waters which, when of no benefit to a riparian owner or to his land and not used by him, may be taken at will by any person who can lawfully gain access to the stream, but are concerned with a natural flow of water, which, under the established doctrine of the California decisions, is annexed to the soil, not as an easement or appurtenance, but as a parcel. (*Herminghaus* v. *Southern Cal. Edison Co.,* 200 Cal. 81 [252 Pac. 607].) The beneficial use of the flow of the water in the Alhambra wash by respondents Yonker had become a property right vested in them by thirty years of usage. These . respondents purchased land through which flowed this water, and constructed bunkers and equipment thereon with which they sifted sand and gravel which was washed upon the lands by the stream, and which commodity they sold commercially. There is nothing in the record here indicating that the channel or improvement as proposed to be constructed by the appellant Flood Control District was intended to

prevent any damage by erosion of lands of other owners from whence came rock, sand and gravel that was deposited on respondents Yonker's land. ■ In fact, it is conceded that the proposed improvement was primarily constructed to control flood waters and not to protect other riparian owners from erosion through the natural flow of water upon their land; and, as heretofore stated, the theory of respondents Yonker is that prior to the installation of the improvement proposed to be constructed by appellant Flood Control District, respondents Yonker were receiving upon their land deposits of rock, sand and gravel held in suspension by the waters of the Alhambra wash; and it must also be remembered that over a period of some thirty years, during which the rock, sand and gravel were utilized for commercial purposes by the owners of the land here in question, no one alleging superior rights attempted in any way to interfere with the use to which respondents Yonker were putting their lands. This certainly was a beneficial use, and it was dependent for its success and consequent income upon the uninterrupted natural flow of the waters. That the water, to be put to a beneficial use, must be utilized for irrigation or domestic purposes alone, is not the law. In *City of Los Angeles* v. *Aitken*, 10 Cal. App. (2d) 460 [52 Pac. (2d) 585], the plaintiff city contended that it did not have to pay for the damage to the owners of property on the shore of Mono Lake who had constructed pleasure resorts thereon which such owners operated for a profit, it being the contention of the city that such damage was not compensable in a condemnation proceeding. However, in accordance with the preceding principle announced by us, the court said:

"The attractions of the traveling public for Mono Lake include its unusual and picturesque location, the beauties of its surroundings and the pleasure of boating, bathing and the hunting of wild ducks and geese which frequent the lake in large numbers during certain seasons. The evidence indicates that the respondents depend for their livelihood and the maintenance of their resorts chiefly on the incomes derived from their transient guests and customers. When the lake is destroyed, the surrounding country will be converted into a desert and their properties will become valueless. . . .

" . . . It is also true that the mere privilege of bathing, boating and hunting on a navigable lake by the owner of a

marginal property thereon, is not such a beneficial use of the lake as will entitle one to compensatory damages for the destroying of those advantages. In the present case, however, the respondents are not complaining of their loss of the personal privileges of bathing, boating or hunting on Mono Lake. They purchased land bordering on this unique lake and constructed buildings and improvements thereon for the maintenance of auto camps and pleasure resorts which are dependent for their success upon the income derived from the traveling public which is attracted to this alluring lake by these advantages. These enterprises depend on the continuation of these attractions. Without the existence of this lake and its surrounding attractions the value of the respondents' properties will practically be destroyed. These privileges and attractions constitute important assets in determining the value of their properties. Moreover, *among the essential littoral rights which are possessed by the respondents is their lawful right to the unmolested access to the lake.*" (Italics added.)

In 67 Corpus Juris, page 852, section 279, it is said: "One who owns lands adjacent to a natural lake is entitled to have the waters therein preserved in their natural state. Thus a riparian owner is entitled to have the waters of the lake upon which his property abuts remain at their accustomed level without interference."

In the case of *Martha Lake Water Co.* v. *Nelson,* 152 Wash. 53 [277 Pac. 382], the Supreme Court of that state held that the water company could not appropriate the water of a nonnavigable lake to be used on nonriparian land without first condemning the riparian rights of owners of land bordering thereon, and paying them just compensation for the detriment to their property as the result thereof. Further, in accord with the principle we have herein enunciated, it has been held that the owner of a mill which was situated on a stream near the outlet of a lake was entitled to relief against the city for greatly reducing the volume of water in the lake and for diminishing the stream, under authority of an act of the legislature, so as to impair the efficiency of the mill, by pumping from the lake several million gallons of water daily and conveying it by means of an aqueduct a great distance to the city for municipal purposes. (See Black's Pomeroy on Water Rights, p. 9.)

In the comparatively recent case of *Litka* v. *City of Anacortes*, 167 Wash. 259 [9 Pac. (2d) 88], it was held that the owner of property adjacent to nonnavigable Lake Campbell, which had an area of 320 acres, who constructed a dwelling house, bath houses, cabins and a dock thereon, using the place as a resort, where he ran a small store, served meals, rented boats and conducted a bathing beach and camp ground, *and which had no value for agricultural purposes,* was entitled to just compensation against the city of Anacortes for damage to his property resulting from its pumping nearly all of the water from the lake for municipal purposes, leaving an unsightly, barren mud flat in lieu thereof. Particularly appropriate to the litigation now before us is the language of the court in the last-cited authority, when it said: ''When the city appropriated the water from the lake, it took from the respondents the very thing that was necessary and essential to the use of their property, and a valuable property right.''

So in the case at bar, when the appellant Flood Control District diverted the waters of Alhambra wash, it took from the respondents Yonker the very thing that was necessary and essential to the use of their property, and the record shows the highest and best use to which it could have been put and had been put for some thirty years. This was a valuable property right; and under our system of government an attempted invasion of the established doctrine of eminent domain in the guise of the exercise of police powers, so as to deprive individuals of their property rights without just compensation, finds no countenance. As was said in *City of Los Angeles* v. *Aitken, supra,* ''In the interest of justice the property rights of individuals should be carefully guarded. Governments are intended primarily to protect the rights of their individual citizens. The equitable and well-established doctrine of eminent domain should not be invaded in the guise of the exercise of police powers so as to deprive individuals of their property rights without just compensation. Neither the Constitution nor the laws of California are intended for any such unjust purpose.''

We therefore hold that the rights possessed by appellant Flood Control District as a public body give it no right to arbitrarily divert the natural flow of water from the lands of respondents Yonker for other uses and purposes, because,

although the rights possessed by appellant Flood Control District be public in their nature, such rights can only be acquired under and by virtue of the sovereign right of eminent domain, *and upon making just compensation.* The use to which the water here in question was put by respondents Yonker in no way contravened the provisions of section 3, article XIV, of the Constitution of this state. The trial court therefore was correct in instructing the jury that severance damages could be awarded to respondents Yonker.

As to the amount of damages awarded to the respondents Yonker, there being in the record evidence of sufficient substantiality, if believed by the jury, to warrant an award in the amount given, this matter is governed by the familiar rule that appellate courts will not set aside a verdict for the award of which there is substantial evidence in the record. The credibility of witnesses and the intrinsic weight and value of testimony are questions for the jury.

As to appellant's claim that the evidence as to severance damages concerning defendants Yonker's property was wholly speculative and conjectural, it is sufficient to say that there is evidence in the record given by witnesses whose competency to testify was established, to the effect that in arriving at the amount of respondents Yonker's damages, they took into consideration the condition of the property, the use to which it had been put, the existing advantages for making a practical use of the property, and such advantages as might be reasonably expected in the immediate future. These are all matters for consideration in estimating the value of lands. (*San Diego Land etc. Co.* v. *Neale,* 88 Cal. 50 [25 Pac. 977, 11 L. R. A. 604].)

With reference to the verdict in favor of defendant Carroll, appellant also urges that the amount is excessive and unreasonable, and for that reason the judgment should be reversed. Witnesses for both sides at the trial practically conceded that defendant Carroll's property was rendered valueless by the improvement, and she herself testified that it had a value of $4,000 which was totally destroyed by the improvement; while one of the expert witnesses testified that the property was worth within $60 of the amount awarded by the jury. Owners are presumed to know the value of their property, and being permitted under the law to testify thereto, their evidence in that regard is entitled

to be weighed and considered by the jury. ■ It may be true that the finding of the jury upon the question of damages sustained by respondent Carroll operated unjustly against appellant Flood Control District, but it is equally true that the findings of juries as to damages in any case may at times be unjust; but until some better and safer method of estimating the compensation to be awarded to the owners of property in condemnation proceedings is devised, we must be content to abide by the verdict of an impartial jury, notwithstanding the possibility that injustice may sometimes be done. In any event, as to excessive damages, a new trial may not be granted because the verdict seems large, or because it is larger than the court, if sitting as a jury, would have given; but only where it appears that it was "given under the influence of passion or prejudice". (Sec. 657, Code Civ. Proc.) In other words, the "verdict will not be disturbed as excessive unless the damages awarded are so excessive as to indicate that the jury acted under such influence". (20 Cal. Jur. 101.) There is nothing in the record indicating that the jury in the instant case was actuated by elements of passion or prejudice in believing and acting upon testimony which was admissible and competent, and which, if believed, justified a finding in favor of respondent for the amount of damages awarded by the verdict.

■ Appellant next complains that the court by its instructions misdirected the jury, and in particular assails an instruction which in part contains the following language: "However, in fixing the amount of damages sustained by said defendant, by way of severance, as of said date, you are further instructed that said damages, if any *are tortious in nature,* and the measure of such damages consists of the amount which will compensate said defendant for all the detriment proximately caused thereby, whether it could have been anticipated or not. It was proper for said defendant to prove that the highest and best use of the land condemned was for the production of sand and gravel, or that it was peculiarly adapted for that use, and what it was capable of producing, both as to quality and quantity. To that end, it was proper for said defendant to show what the land had ordinarily produced within a reasonable time in the past as bearing upon what it might reasonably be expected to have produced when destroyed or condemned.

In other words, the damages which, in the ordinary course of things, would be likely to result *from a tortious injury to property* must be taken as the basis of the compensation to which the defendant would be entitled."

At first blush, this and some other instructions complained of, the narration of which would unduly prolong this opinion, might seem to be fatally defective. But a reading of all the instructions given by the trial court, and a consideration of them as a whole, indicates that the jury was fully, correctly and fairly instructed that in determining the value of the parcels sought to be taken, "you must use, as a basis for your calculation and determination, the market value of the property as of March 10, 1936"; while another instruction stated that the jury had two questions for determination, first, the market value of the property as of March 10, 1936, and, second, the damages accruing by reason of the severance and the construction of the improvement. In another instruction we find a correct definition of market value, which, when taken together with still another instruction, properly advised the jury that the measure of damages was the market value of the property as defined by the court. The record contains instructions to the jury stating that they must exclude uses and purposes which are remote and speculative and must not take into consideration the value as a plan, or consider the earnings from the collection and sale of rock and gravel. As to market value, the court advised the jury that the same is to be determined in view of all the facts which would naturally affect its value in the minds of purchasers generally, and that any existing facts which entered into the value of the land in public and general estimation, and tending to determine in this connection, should be considered. The jury was further admonished that they could not take into consideration speculative uses or purposes, or any special plans for future improvement or for the future use of said property. The court also cautioned the jury in its instructions that in determining the damages by reason of the severance and the construction of the improvement, they must measure the damages by determining the depreciation in the market value of the property remaining.

It is not proper for a reviewing court to take one isolated instruction and consider it alone, separate and

740

apart from the other instructions given. (*Burr* v. *Floyd,* 137 Cal. App. 692, 698 [31 Pac. (2d) 402].) Instructions must be considered in their entirety, and if, when so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though some isolated passages from a single instruction are amenable to criticism. (*Hamilton* v. *Hammond Lbr. Co.,* 13 Cal. App. (2d) 461, 463 [56 Pac. (2d) 1257]; *Douglas* v. *Southern Pac. Co.,* 203 Cal. 390 [264 Pac. 237].) Reading all of the instructions, we are satisfied that the jury properly understood, and, in legal theory, at least, adopted the rules properly applicable to the determination of an action in eminent domain, and that the idea conveyed in the several correct instructions must have preponderated in the considerations of the jury, as a consequence of which the instructions complained of as being erroneous neither contributed to nor controlled the verdict. (*Saltzen* v. *Associated Oil Co.,* 198 Cal. 157 [244 Pac. 338].)

Finally, appellant urges a reversal upon the ground of alleged misconduct on the part of one of the jurors. On the hearing of the motion for a new trial, an affidavit was presented wherein the city engineer of Alhambra deposed that during the progress of the trial one of the jurors trying the cause inquired of him concerning the nature, character, quality, price and value of rock, sand and gravel for building purposes from the deposits and plants in San Gabriel wash to the east of Alhambra, and that affiant city engineer answered the juror's questions to the best of his opinion and judgment as to quality, price and value, and "discussed the matter generally with her". This affiant further stated in his affidavit that the juror in question asked him particularly with reference to such materials taken from Alhambra wash in or in the vicinity of the cities of Alhambra and San Gabriel, which questions affiant further stated he answered to the best of his opinion and judgment. These were matters concerning which witnesses testified during the trial to different prices and values thereof, and upon which the court predicated an instruction concerning the measure of compensation to be awarded and on determining the fair market value of the land taken with the sand, rock and gravel in it. Because of this action upon the part of one of the trial

jurors, appellant earnestly insists that the judgment herein should be reversed.

So far as respondent Carroll is concerned, this claim is without merit, because the evidence received by this juror from an outside source did not concern any question in connection with the Carroll land which had been made material to the principal issues submitted to the jury for their determination as a question of fact upon which to base their verdict. Respondent Carroll did not claim to be a riparian owner or that she was receiving any rock, sand or gravel by reason of the natural flow of any waters from Alhambra wash through her land.

With reference to respondents Yonker, it nowhere appears in the affidavit that the juror in question communicated to her fellow jurors, either within or out of the jury room, the information obtained as aforesaid; and in fact the contrary is made to appear, from all of which it necessarily follows that the information obtained by this juror could have had no effect whatever upon the verdict of the jury. Further, it has been said that in order to warrant setting aside a verdict for misconduct, it must appear that prejudice resulted therefrom. (*Saltzman* v. *Sunset Tel. etc. Co.*, 125 Cal. 501 [58 Pac. 169].) Reference by us to the transcript in this case indicates that the jury was polled after the rendition of the verdict, and that ten jurors declared the verdict as rendered to be theirs, while two stated to the contrary. Of the two who voted against the verdict in favor of respondents Yonker, one was the juror against whom misconduct is charged. While the record does not indicate that the juror in question favored appellant Flood Control District, it does indicate that she was opposed to the verdict in favor of respondents Yonker. In the face of this state of the record, surely it cannot be claimed that her misconduct materially affected the substantial rights of the appellant, but on the contrary, however reprehensible was the conduct of the juror, it tended to aid rather than to militate against the appellant. The trial court was therefore correct in denying the motion for a new trial on the last-named ground.

No other points raised require discussion.

From the foregoing, it follows that the judgment from which this appeal is taken should be, and it is, affirmed.

York, P. J., concurred.

DORAN, J., Dissenting.—I dissent as to that portion of the prevailing opinion affirming the judgment in favor of respondents Jacob H. Yonker and Kathryn L. Yonker. It so happens that these respondents have been for some time the beneficiaries of what, in geology, is known as ''erosion''. To most landowners this process is detrimental. The appellant Flood Control District, by interrupting and preventing the process of erosion above respondents' land and upon land not owned or controlled by respondents, has destroyed a sand and gravel pit on respondents' land. In other words, the continued existence of respondents' sand and gravel pit depends upon the destruction, by erosion, in some degree of the land above, as a result of which respondents' sand and gravel pit is replenished thereby from time to time during the rainy season.

Respondents Yonker are not entitled to severance damages for the following reasons: First, in my opinion, the law with respect to riparian rights has no application to the questions involved. The continued benefit of erosion under such circumstances creates no vested right, for in no sense is such a benefit a part of what is recognized, under the law, as ''riparian rights''. Second, the Constitution provides that private property shall not be taken or damaged for public use without just compensation. However, the process of erosion is not private property, and such process therefore is no part of respondents' property. To award damages on such a basis would, in effect, compensate respondents for something which they did not own. Respondents can claim no title, as part of their ''private property'', to sand and gravel which may or may not be deposited thereon, according to the weather. The loss of such a benefit as claimed by respondents is not compensable in damages, in my opinion, and the authorities relied upon by appellant, to my mind, support appellant's contention in this regard.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 8, 1938.

# MEMORANDUM CASES.