**UNITED STATES v. 4.105 ACRES OF LAND IN PLEASANTON et al.**

**SAME v. 100 ACRES OF LAND NEAR PLEASANTON et al.**

Nos. 22466, 22803.

District Court, N. D. California, S. D.

July 10, 1946.

M. Mitchell Bourquin, Sp. Asst. to Atty. Gen., and John J. Healy, Jr., and J. Harold Weise, both of San Francisco, Cal., for plaintiff.

John J. O'Toole, City Atty., and Dion R. Holm, Public Utilities Counsel, both of San Francisco, Cal., for defendant City and County of San Francisco.

GOODMAN, District Judge.

These two actions, filed successively, and consolidated for trial, are to condemn the fee of two separate parcels of land situated in the Livermore Valley near the town of Pleasanton, California. The lands overlie a subterranean basin of water-bearing strata referred to as the Pleasanton Gravels, in which is stored a vast quantity of percolating waters. The actions were instituted under the provisions of the Second War Powers Act, March 27, 1942, 56 Stat. 177, 50 U.S.C.A.Appendix, § 632, for the purpose of gaining access to this underground water supply—by° the sinking of wells on the condemned parcels—in order to provide water facilities for the Navy Replacement and Recuperation Centers located on other nearby lands, and known as Camp Parks and Camp Shoemaker.

The earlier action (No. 22466) involving 4.105 acres of land was filed February 3, 1943. The later action (No. 22803) involving approximately 100 acres of land was filed October 14, 1943, when it became necessary to expand the water facilities to meet the increased needs of the two camps. After the actions were filed, the United States entered into possession of the lands pursuant to an order granting immediate possession, and applied them to the uses for which they were being taken. At the time of the trial in May 1945, the United States was diverting to these camps, through the wells it had sunk on the condemned parcels, underground waters to the extent of approximately six million gallons daily.

In action No. 22466, a declaration of taking was filed by the Secretary of the Navy and, on April 13, 1944, judgment upon this declaration of taking was entered. By its terms, the judgment vested in the United States "the full fee simple title" to the 4.105 acres. The evidence and written stipulation filed show that the fee of this parcel, when taken, was in James Lemas and Mary Lemas, his wife, as to a one-half interest, and in James Lemas, Jr., as to the remaining half-interest. There is before the Court the matter of fixing and awarding just compensation for the taking of their fee interest in that parcel.

In action No. 22803 involving the 100 acres, no declaration of taking was filed. The fee owner of this land, the Spring Valley Company, Ltd., a corporation (formerly known as Spring Valley Water Co.), has accepted the sum of $20,978 for the taking of its fee interest, and has consented to the entry of judgment in that amount as full compensation therefor. In this action, the United States moved to amend its complaint to limit the estate sought to be acquired to the fee simple title "subject, however, to all water rights not owned by the Spring Valley Company, Ltd., * * *." This motion was denied on March 5, 1945. On the same day, the plaintiff filed a partial dismissal and abandonment "as to all water rights not owned by the defendant, Spring Valley Company, Ltd."

In each action, the City and County of San Francisco appeared claiming an interest in the waters of the subterranean basin as an appurtenant to certain other lands which it owns in fee and which overlie the basin. It is the contention of the City that the condemnation of the two parcels of land by the United States and its tapping of the subterranean water supply have resulted in an invasion of a property right of the City in and to such waters, for which it must be compensated. The United States, on the other hand, contends that it has neither taken nor does it seek to take any property or property right of the City.

The history of the acquisition of the City's alleged interest in the condemned parcels, as disclosed in the record, is as follows:

On March 3, 1930, the City acquired, by deed, the entire water system properties

of the Spring Valley Water Company. Included among them were certain parcels of land overlying the Pleasanton Gravels described in the deed as Parcels 69, 70, 71 and 72. These parcels contained the wells and pumping facilities whereby the water company diverted the underground waters of the Pleasanton Gravels to San Francisco for municipal uses. The City still owns the fee to some of these lands. While portions of them have been conveyed away, the City has reserved to itself all rights in the conveyed portions with respect to the pumping and diverting of the underground waters. The Spring Valley Water Company in 1930 also owned certain other overlying lands, containing 3920.461 acres. These it did not convey to the City. *The condemned parcels are among these lands.* These lands so retained, and other overlying lands disposed of before 1930, had been acquired by the water company in 1910 or thereabouts to protect it, in its diversion of the underground waters, from the complaints of overlying landowners. As against these lands so retained by the water company, and as appurtenant to the operating properties conveyed to the City in the Pleasanton area, the City was granted by the 1930 deed the right to divert underground waters to the extent of 15 million gallons daily, subject only to the right of the water company and its successors to use the underground waters on the retained lands for domestic or irrigation purposes. In addition, the 1930 deed granted to the City all the rights to divert which the water company had reserved to itself upon the prior disposition of certain other overlying lands it had owned. The pertinent portions of the 1930 deed with respect to the grant of these water rights reads as follows:

"As incident and appurtenant to said Parcels 69, 70, 71 and 72 of the Alameda County lands, the Water Company hereby grants and conveys to the City the right, as against any and all lands in the said County of Alameda not hereby conveyed but retained by the Water Company which are situate in the Amador Rancho, Santa Rita Rancho and the Bernal portion of the Rancho el Valle de San José and lying within a zone bounded on the south by County Road No. 2000 and the northerly right of way line of the Southern Pacific Railroad running from Pleasanton to Livermore, on the west by County Roads Nos. 1927 and 1933, which run northerly from the westerly terminus of said County Road No. 2000 to the Town of Dublin; on the north by the County Road running from Dublin to Livermore, and on the east by the east boundary line of Lot 5 of said Bernal portion of the Rancho el Valle de San José and its northerly extension to said County Road running from Dublin to Livermore, to take water from said Parcels 69, 70, 71 and 72 by means of wells or otherwise up to but not in excess of 15,000,000 gallons during any one day for any use desired by the City either on or off said parcels; and as incident to the acquisition by the City of said Parcels 69, 70, 71 and 72 and the right to take and divert said 15,000,000 gallons of water daily, the Water Company hereby grants and conveys to the City all pumping rights or rights to take and divert subterranean waters reserved to the Water Company in any grant or conveyance heretofore made by it of any lands situate within the zone hereinbefore in this paragraph described. This grant to the City of said Parcels 69, 70, 71 and 72 and the right to take water from said parcels to the extent of 15,000,000 gallons during any one day shall not be taken or considered to be a limitation on the right of the Water Company or its successors and assigns to take from any and all of the lands retained by the Water Company within the said zone hereinbefore particularly described, by means of wells or otherwise, such water as the Water Company and its successors or assigns may require for irrigation or domestic use on such retained lands, but shall be deemed to be a limitation on and restriction against the right of the Water Company and its successors and assigns to pump or take water from any of the said retained lands for use elsewhere than upon such retained lands."

The City also acquired from the Spring Valley Water Company by the 1930 deed the benefits and obligations of certain agreements between the water company and some thirty-five overlying landowners, the town of Pleasanton and the Pleasanton

Township County Water District. These overlying owners represent all but possibly one of the owners of land within the water district. By these agreements, in consideration of certain acts to be done by the water company to protect the signatory landowners from damage which might be caused them by the lowering of the water table, the water company was granted the right to take all the underground waters it needed for use either on or off overlying lands.

From 1930 until the completion of the City's Hetch-Hetchy Water Supply project in 1934, the City appropriated the waters of the Pleasanton Gravels in varying quantities (as shown on Defendant's Exhibit L) to augment its municipal water supply. Since the coming in of the Hetch-Hetchy Water Supply, only sufficient waters of the Pleasanton system have been diverted to supply the local needs of the adjoining area. The quantity of water needed for these uses has been relatively small. The City now regards the Pleasanton water system in the most part as an emergency stand-by source of supply in the event some disaster cuts off the Hetch-Hetchy supply.

There is seemingly little dispute about the fact that, to the extent of the City's use of the underground waters, it was of such nature as to ripen, if continued, into a prescriptive right at the end of the prescriptive period. (See plaintiff's brief, page 4.)

Determination of the merits of the City's claim to an award of compensation herein necessitates inquiry into the evidence for the legal answers to the following queries:

I. What, if any, estate or interest has the City and County of San Francisco in the condemned parcels?

II. Has the United States by *these proceedings* taken any estate or interest of the City and County of San Francisco in the condemned parcels; or has there been a taking "in actuality" of any property of the City for which compensation for loss should be made?

III. If the United States has taken any estate or interest of the City and County of San Francisco, what (if any) evaluation may, in the light of the evidence, be legally placed on such interest to form the basis for an award of compensation herein?

There is a fundamental difference between the right of the City in the 100 acre parcel (action 22803) and its right in the 4.105 acre parcel (action 22466). It requires clarification before reaching decision.

In action 22803, involving the 100 acre parcel, no declaration of taking has ever been filed. The plaintiff by motion filed February 3, 1945, sought to amend its complaint therein as follows: "That the estate or interest which plaintiff seeks to take and condemn is as follows: The fee simple title in and to Parcel A hereinafter described, subject, however, to all water rights not owned by the Spring Valley Company, Ltd., * * *." This motion was made in compliance with a request received by the United States Attorney General from the Secretary of the Navy by letter dated January 20, 1945, in which he stated:

"It has now been determined unnecessary to acquire in the above named proceeding any water rights other than those owned by the Spring Valley Water Company."

"It is requested, therefore, that the petition in condemnation be amended to state that the estate sought is the fee simple title, subject however to all water rights not owned by the Spring Valley Water Company." (Parenthetically, this evidences the Government's original intention to take the City's water rights.)

On March 5, 1945, the motion was denied and an exception noted. On the same day, the plaintiff filed a partial dismissal and abandonment of "the above captioned proceeding as to all water rights not owned by the defendant Spring Valley Company, Ltd."

The motion was denied for the reason that the Government was then in possession of the 100 acres and appropriating underground waters, and it was impossible to then ascertain whether or not— or to what extent, if any—there had been any taking in actuality of the City's alleged property rights. In view of what the full

trial has revealed, I am convinced the denial of the motion to amend the complaint to limit the taking, should be vacated and the abandonment as requested by the United States, allowed, and it is so ordered. United States v. 5901.77 Acres, D.C., 65 F. Supp. 454; O'Connor et al. v. United States, 9 Cir., 155 F.2d 425. It follows therefore that the City is not entitled to compensation in action 22803. The fee title to the 100 acres is now being taken expressly subject to all water rights not owned by the Spring Valley Company, Ltd. As a result, full recognition is therefore accorded to the City's prior appropriative water rights. The diversions by the Government on the 100 acre parcel will be subordinate to the City's water rights. As to that parcel, the City is now in a position to assert its prior rights when it desires to exercise them, and to invoke the aid of a court of equity in the event the intervening Government appropriations in the meanwhile threaten to destroy the source of supply or to ripen into a prescriptive right. And that is the extent of the City's water rights under California law. Cal.Const. Article XIV; Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 3 Cal.2d 489, 45 P.2d 972; City of Lodi v. East Bay Municipal Ut. Dist., 7 Cal.2d 316, 60 P.2d 439. The United States is fully justified in its act of partial abandonment. There has been no final taking of the fee. The act of the United States in diverting the waters through wells on the 100 acre parcel has not of itself amounted to a taking in actuality of property of the City. The corpus of the waters taken does not belong to the City. Kidd v. Laird, 15 Cal. 161, 179, 76 Am.Dec. 472; Palmer, etc., v. Railroad Comm., 167 Cal. 163, 138 P. 997. The underground water supply has not, by reason of the Government's diversions, been presently impaired. The evidence indicates that the annual Navy take from the subterranean basin has not exceeded the annual in-flow into the basin. At least, it must be admitted that the source of supply is presently intact. Therefore, to allow the United States to abandon the taking of the City's property rights with respect to the 100 acre parcel, works no injury to the City. In fact, counsel for the City expressly stated in his opening brief (p. 11) that "The City would much prefer retaining its water and water rights than to receive compensation therefor * * *." The allowance of the abandonment accomplishes just that. Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 requires the granting of the Government's application to partially abandon in the case of the 100 acre parcel because there has as yet been no taking, by law or in actuality, of the City's rights with respect to that parcel. "Until taking, the condemnor may discontinue or abandon his effort." Danforth v. United States, supra, 300 U.S. at page 284, 60 S.Ct. at page 236, 84 L.Ed. 240.

That the United States may in the future appropriate waters to the detriment of the City's prior right is not a proper subject of inquiry in the proceeding to condemn the 100 acre parcel. If such happens and the Government refuses to recognize the City's prior right to the waters, the City's right to compensation will then arise. But the possibility of a future taking is not of itself presently compensable. Nor should the court retain jurisdiction for the purpose of awarding compensation in the event of a future taking. The court may only retain jurisdiction to award future damages *for a present taking,* when the ascertainment of such future damages is too uncertain for present adjudication.

We now reach, as to the 4.105 acre parcel, the three questions propounded at page 7 of this opinion. They are novel and indubitably of first impression.

### I.

### What Interest Has the City in the 4.105-Acre Parcel.

The City contends that the evidence establishes a vested proprietary interest on its part derived from its right of appropriation arising in turn from (a) the 1930 grant (b) adverse use for the prescriptive period and (c) prior appropriation to a beneficial use.

I have concluded for reasons to follow that the City's claim to a proprietary interest in the condemned parcel is valid. Also,

that it is based upon grant, prescription and to a minor extent, on the theory of priority of appropriation as well.

However, the rights acquired by the City through the 1930 grant are so much greater and consequently, more valuable than those acquired by prescription or prior appropriation that more extended consideration is given to that source of title.

### The 1930 Grant.

If the 1930 grant created only a personal contractual relationship between the City and the water company and not an interest in the retained lands, as claimed by the plaintiff, then it would follow that the plaintiff in taking the lands, took no interest of the City. Brooklyn Eastern Dist. Terminal v. City of New York, 2 Cir., 139 F.2d 1007, 152 A.L.R. 296.

I hold, however, for the reasons to be given, that the grant created more than a contractual relationship between the parties; that it created an interest in the condemned parcel sufficiently in the nature of an easement to impose a servitude on the parcel.

■ Primarily, it must be conceded that the water rights granted the City are covenants running with the land, thus burdening each successive owner. Cal.Civil Code, §§ 1460, 1462, 1468. Furthermore the scope of the covenants of the grant is wider than that attributed to them by plaintiff. There are overlying beneficial uses recognized by law other than domestic and irrigation, to which the right of appropriation granted the City was not subordinated by the terms of the 1930 deed. Overlying beneficial uses are regarded in law as akin to riparian beneficial uses and are given similar protection. "The overlying owner in this state has been held to have analogous rights to those of a riparian." Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., supra, 3 Cal.2d at page 525, 45 P.2d at page 986. Thus, in Los Angeles County Flood Control Dist. v. Abbot, 24 Cal.App.2d 728, at page 734, 76 P.2d 188, 192, the Court in speaking of the vested property right of riparian owner to make beneficial riparian uses of the waters of a stream said: "That the water, to be put to a beneficial use,

must be utilized for irrigation or domestic purposes alone, is not the law."

Therefore, to the extent that the water rights granted the City cut down the beneficial uses to which the underground waters might otherwise be put on the retained lands, a limitation was imposed upon the exercise of a property right inherent in the ownership of the retained lands; for the right to make beneficial riparian (overlying) use of waters has always been considered part and parcel of the lands to which they attach. Palmer etc. v. Railroad Comm. supra.

Insofar as the grant of these water rights thereby diminish a vested property right inhering in the ownership of the condemned parcel, there was created an easement upon such parcel, as the servient tenement, appurtenant to the lands conveyed to the City, as the dominant tenement.

■ "An easement involves primarily the privilege of doing a certain act on, or to the detriment of, another's property." Wright v. Best, 19 Cal.2d 368, 381, 121 P.2d 702, 710. (emphasis supplied.)

It is contended by plaintiff that by the grant the City received only the privilege of taking surplus waters not needed for beneficial uses on the retained overlying lands—a privilege available under California law to anyone, including the Navy here, who could put such surplus to beneficial use: Burr v. Maclay Rancho Water Co., 154 Cal. 428, 98 P. 260; Tulare Dist. v. Lindsay-Strathmore Dist., supra.

■ Strictly speaking, the 1930 grant, viewed as conferring a right of appropriation of only surplus waters in excess of those required for overlying needs, did not confer the privilege of doing an act on the City's lands to the detriment of a property right inherent in the ownership of the retained lands. City of San Bernardino v. City of Riverside, 186 Cal. 7, 29, 198 P. 784. When the water company for itself and its successors subordinated its right to divert waters by means of wells on the retained lands to the right of appropriation granted the City and its successors by means of wells on its own lands, the water company may not have given up any prop-

erty right in the strict sense of the word. Rather, it subordinated, in favor of the City, the power to appropriate and divert underground waters which it had by virtue of its ownership of overlying lands giving it the means of access to such underground supply. But in so doing, the water company restricted the use to which its lands could lawfully be put—in somewhat the same manner that the recognized easement of light and air restricts the possible uses to which the servient tenement is adaptable. The City, as a result, acquired an appropriative right invulnerable to destruction or damage by, and paramount to the acquisition of prior appropriative or prescriptive rights by anyone using the underground waters through wells on the retained lands.

 The City's right, based as it was on grant, was not dependent on continued user, as are other rights of appropriation. It was not lost by non-user. Watson v. Heger, 48 Cal.App.2d 417, 120 P.2d 153; Griffin v. Parker, 124 Cal.App. 701, 705, 13 P.2d 403. But for this grant, while not diverting the water itself, the City could not have prevented superior rights from attaching to the underground waters by intervening appropriators on the retained lands. For the doctrine of appropriation is "he who is first in time is first in right." Joerger v. Pacific Gas & Electric Company, 207 Cal. 8, 26, 276 P. 1017, 1026.[1] It is quite true that the grant to the City does not, under California law, entitle it to deny to others the surplus waters, for beneficial use, while the City is not so using them. California Const. Art. XIV, Sec. 3; Burr v. Maclay Rancho Water Co., supra. But the effect of the grant to the City is to preserve to it in the meantime, the paramount right to make future diversions of the water under its grant, when and as needed. And this right will be protected by a court of equity from impairment by any intervening appropriation which threatens to destroy the source of the water supply or to ripen into a prescriptive title. California Const. Art. XIV, supra; Burr v. Mac-

lay Rancho Water Co., supra; Peabody v. City of Vallejo, 2 Cal.2d 351, 40 P.2d 486; Tulare District v. Lindsay-Strathmore Dist., supra; City of Lodi v. East Bay Municipal Utility District, supra.

The granted water rights conferred a substantial and marketable property right in the City appurtenant to the land conveyed to it. A corresponding burden was imposed on the retained lands restricting the uses to which they might otherwise lawfully be put when such uses conflict with the priority of right given the City.

 Where, as here, the restrictive covenants create substantial and marketable property rights appurtenant to the lands benefited, but distinct therefrom, to say in such case, that those rights are merely contractual, that they do not create a compensable interest in the lands burdened by the restrictions, that the Government may take such lands (cleared, of course, of the burden of the covenants of the grant) and not be obliged to compensate for any present and estimable destruction or diminution in the value of those rights occasioned by the taking, on some theory that strictly speaking, the rights did not create an estate in the lands, is too unconscionable to be supported in law.

 To the contrary, California authority supports the conclusion that the water rights granted are in the nature of an easement in the condemned parcel. Wright v. Best, supra; Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 P. 858, 15 L.R.A.,N.S., 359. That easements are "interests" in real property has been federally recognized. Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725; United States v. Sunset Cemetery Co., 7 Cir., 132 F.2d 163.

 Furthermore a right with respect to real property need not attain the dignity of "an estate in real property" to be compensable when taken into the public domain. Lesser and more limited property rights have been recognized to merit just

---

[1] While the Water Code of California (Chap. 368, St. 1943) might be said to have modified this rule in some respects, it does not apply here, because the Pleasanton Basin is not a "subterranean 

[stream] flowing through known and definite channels" and is therefore specifically excepted from the provisions of the Code. Sec. 1200.

compensation pursuant to the Constitutional mandate. United States v. Town of Nahant, 1 Cir. 153 F. 520; Brooklyn East. Dist. Terminal v. City of New York, supra.

The evidence affirmatively shows the City to also hold an estate in the condemned parcel derived through adverse user of the underground waters for the statutory (California) prescriptive period. And the prescriptive title so held amounts to an easement upon the lands whose appurtenant waters have been consequently reduced. Nelson v. Robinson, 47 Cal.App.2d 520, 118 P.2d 350. Likewise the evidence discloses an estate of the City arising from priority of user. City of Lodi v. East Bay Mun. Ut. Dist., supra. But such estate does not attach to any greater quantity of the underground waters than is being actually diverted. The City does not own the subterranean basin as a storage reservoir and the waters therein do not belong to the City by right of appropriation. Further consideration of the City's prescriptive and priority of user title is unnecessary inasmuch as the court sustains the more comprehensive and valuable title of the City derived from the grant itself.

## II.

(a) Has the United States by this Proceeding Taken Any Estate Or Interest in this Condemned Parcel, or
(b) Has There Been a Taking "in Actuality."

The declaration of taking (action 22466) states: "That the estate hereby taken in said lands for the public use aforesaid is: The full fee title * * * subject however to the rights of the public, as set forth in the description of said parcel." The taking of the fee title is a taking of the entire title and necessarily includes all lesser estates embraced within the whole. United States v. Sunset Cemetery Co., supra; Duckett & Co. v. United States, 266 U.S. 149, 151, 45 S.Ct. 38, 69 L.Ed. 216.

Whatever property right the City has in this parcel, not having been excepted from the taking, it is included therein. Even granting for the moment, that the water rights do not rise to the status of an "estate" in the condemned parcel, nevertheless there was a partial taking in actuality of the City's rights in the underground waters resulting from the combined effect of the condemnation of the fee and the actual appropriation of the waters underground.

The fallacy of the Government's position on the extent of the taking herein lies in its separately arguing that neither (a) the taking of the fee of the parcels nor (b) the appropriation of the water underground, take any property of the City. The effect of each act singly, may well be as the United States contends. But the combination of the two acts effects an entirely different result. Then there occurs a subordination of the City's granted rights of appropriation in the subterranean waters to those acquired by the Government. If all the United States did was to condemn the fee of the parcels (for some purpose other than to obtain access to the underground waters), then if the City is not regarded as having an "interest" in the parcels, it could well be said that no taking of its rights in the underground waters results by reason of the condemnation of the fee. Also, if all the United States did was acquire the lands (by purchase or condemnation) subject to the restrictive covenants of the 1930 grant and was thereafter to divert surplus underground waters, it could properly be said that there was no taking of the City's water rights. For in that case, the City's rights, having been recognized by the Government, when it took the lands, would then have been preserved to the City for its future enjoyment. And no appropriation of surplus underground waters by the United States under such circumstances, would have created a prior right of appropriation in the United States, nor would the United States be able to acquire a prescriptive title adverse to the City. But when the Government condemns the fee—and thereby clears the lands and itself of the effects of the restrictive covenants in favor of the City,—and follows it up by appropriating underground waters, it subordinates the City's rights in the subterranean basin to its own asserted right of appropriation. And to the extent that the City's rights are diminished in value thereby, there is clearly a taking of a prop-

erty right belonging to the City. For the priority of the City's right is the essential ingredient of that right. It is that quality which gives the right the value that it has. Under the circumstances here present the Government can hardly be heard to say that it is merely appropriating surplus waters until such time as the City may need them. Its pleadings and its actions belie such an assertion. By them, it is manifest that the United States intends to appropriate these waters and to assert a paramount right to do so for such time as they may be required for the purposes for which these proceedings were brought. Since the United States did not specify its intent to appropriate for a limited period, and there is no way of knowing how long the United States will require the underground waters, we must assume that it intends to acquire the right to do so in perpetuity, if necessary.

▮ The power of the court to award compensation for the actual taking, is not limited to what is sought *in this proceeding* to be taken, nor is the City relegated to relief therefor in other forums, e. g., the Court of Claims. United States v. General Motors Corp. 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390.

The Second War Powers Act gives statutory authority to the United States to condemn for military purposes "real property * * * or other interest therein, together with any personal property located thereon or used therewith." The United States by its pleadings and actions, showed its intent to acquire a paramount right of appropriation in this underground basin. Therefore, its act of appropriation, committed pursuant to statutory authorization, in combination with its condemnation of the unrestricted fee, does operate to take a property right of the City to the extent that it diminished the value of that right by subordinating it to the prior appropriative right acquired by the United States,—just as the diminution and destruction of the value of the lessee's personality in the General Motors case supra, occasioned by the necessity of its dismantling and demolition as an incident to the Government's taking of the occupancy of the leased premises, was there held to constitute a taking pro tanto of the personalty.

In passing, it should be noted that the scope of intangible rights compensable in condemnation proceedings is being steadily broadened in decisions of the Supreme Court. See United States v. Causby, 66 S.Ct. 1062.

### III.

Evaluation of the City's Water Rights.

For the reasons hereafter set forth, I conclude that compensation should be awarded the City in the amount by which the fair market value of its aggregate water rights in the Pleasanton Basin is shown by the evidence to have been reduced as a result of the Government's taking.

▮ It must be kept in mind that there was here no taking of the City's entire water rights in the underground basin in the sense that the United States acquired title thereto. The dominant estates to which these rights are appurtenant, and the physical properties of the City's Pleasanton system were undisturbed by the taking. It (the taking) resulted from the fee taking of overlying lands not owned by the City and the consequent invasion and subordination of the City's prior right of appropriation in the waters underground. It was therefore, in its nature, a taking by partial destruction and not by acquisition. Such a partial damage is compensable. United States v. General Motors Corporation, supra. See also Duckett v. United States, supra and United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A.,N.S., 385, 19 Ann.Cas. 680; Richards v. Washington Terminal Company, 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, L.R.A.1915A. 887.

▮ Compensation is consequently ascertainable only by reference to the value of the whole of which it was part. United States v. Welch, supra. But in order to here estimate the value of the whole, it first becomes necessary to determine what is to be regarded as the whole property— the unit—of which part was taken. Is it merely the City's water rights as against the condemned parcels, which have been reduced in value, or is it the City's dom-

inant estates with the water rights appurtenant thereto? Is it the Pleasanton water supply system, or is it the entire water supply system of the City and County of San Francisco? If, when the taking occurred, the Pleasanton system were being operated as an integrated, inseparable part of the City's entire system of water supply, it might then properly be a question here of the extent to which the entire system may have been damaged or diminished in value by the taking. United States v. Town of Nahant, supra. But the Pleasanton system is a separable unit of the City's whole system. At present the waters from the gravels, which go into the Pleasanton pipe line by artesian flow, supply only local needs. And the major use of the Pleasanton Supply System to the City is as an emergency stand-by source of supply. It is, therefore, the extent to which the subterranean water rights of the *Pleasanton System* may have been damaged or diminished in value by the taking which is the proper basis for compensation, rather than the damage, if any, to the entire San Francisco water system. Moreover, there is no evidence of the latter. Nor is it at all proper to attempt evaluation of the City's water rights in the subterranean basin as against the condemned parcels *only*. Its rights as against such parcels are no more severally susceptible to an independent market evaluation than would a right of way through several separately owned tracts of land be capable of separate market evaluation as to each of such tracts. Indeed the evidence discloses the obvious absurdity of such a modus of evaluation.[2]

■ Normally the parcels of the City's lands, upon which its wells and pumping equipment are located, as enhanced by the appurtenant underground water rights, should be appraised and then the diminution of their value caused by the partial taking of the appurtenant water rights should be ascertained. Olson v. United States, 8 Cir., 67 F.2d 24; United States v. Welch, supra. But this cannot be done because of the absence of any evidence of the value of the City's dominant estates or of the Pleasanton supply system as a unit. However this lack of evidence is not fatal to an award. For water rights, unlike other easements appurtenant, can be separately evaluated from their dominant estates. Spring Valley Water Co. v. City and County of San Francisco, supra. Consequently it follows that the amount by which the City's water rights, as a unit, have depreciated in value as a result of the taking, fairly represents a sum equal to that by which the whole Pleasanton water system has been thereby reduced in value.

■ Ordinarily, just compensation for the taking of private property is the equivalent of its market value. United States v. Petty Motor Company, 66 S.Ct. 596. Here, there is no evidence of market value for the City's water rights based on recent comparable water rights sales in the vicinity of the Pleasanton Gravels. Neither is there proof of any offers of sale or purchase of water rights in that area since the acquisition of the Spring Valley Water System by the City in 1930. The original cost of these rights to the City is unknown. However, lack of direct proof of market value based on comparable sales or recent offers of sale or purchase, does not necessarily lead to the rejection of the market value concept in fixing just compensation. Absent such sales or offers of sale or purchase, market value may be arrived at upon a consideration of all the facts in evidence which can reasonably be expected to affect the price a purchaser in fair market conditions would have given for the property. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; Welch v. Tennessee Valley Authority, 6 Cir., 108 F.2d 95. The criterion of market value fails to apply only where there is no market at all for the interest condemned, actual or potential, or because in the circumstances, "market value furnishes an inappropriate measure

[2] The manager of the City's water department testified to a value of $250,000 for the right to divert one million gallons daily for each parcel of overlying land, whereas in 1915, this Court evaluated all of the Spring Valley's water rights at $45,000 per million gallons daily. Spring Valley Water Co. v. City and County of San Francisco, D. C., 252 F. 979.

of actual value." United States v. General Motors Corporation, supra. 323 U.S. at page 379, 65 S.Ct. at page 360, 89 L.Ed. 311, 156 A.L.R. 390. Here, the property for evaluation (water rights) is a marketable asset and there is evidence to form the basis of an estimate of its "market value fairly determined." United States v. Miller, supra [317 U.S. 369, 63 S.Ct. 280]. The only loss the City claims to have suffered, which would not be reflected in an award based on market value, is that allegedly inflicted on the value to the City of the Pleasanton water system as a stand-by source in the event of some emergency requiring its immediate utilization. Such a loss, being based on the special adaptability of the property to the use of the owner, is not an element proper for consideration in arriving at fair market value. United States v. Miller, supra. Granted the special value of the system to the City for stand-by source of supply has been proven, nevertheless the exclusion of this factor in determining fair market value does not deprive the City of any right to compensation for a proven loss, for no injury to the system as a stand-by source has been established by the evidence. The Navy diverson of water to the date of trial, of approximately 6 million gallons daily, has not effected any perceptible lowering of the water table. There is no support in the evidence for the claim of the City that if such diversions are continued, the underground storage will be gradually depleted. The City is still in possession of its system and has recourse to it in the event of an emergency need. Injury to the system as a stand-by source, as a result of the prior appropriative title acquired by the Navy and its activities thereunder, is remote and uncertain, not merely in amount, but in the probability of its ever arising. The happening of the emergency occasion for which the system is declared to be held is implausible though not impossible; the Navy withdrawals may first cease. More important however, it does not appear that the Navy's interest in the underground waters, even if asserted to its full extent, will conflict with the City's recourse to an adequate supply of water to meet any *temporary* need created by emergency. For the actual yield of the basin has not been established. In the final analysis, it is loss to the owner that measures the compensation to be awarded. Boston Chamber of Commerce v. City of Boston, supra; Brooklyn Eastern Dist. Terminal v. City of New York, supra; United States v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390. The possibility that such a loss might occur to the City in the future does not, in my opinion, warrant the retention of jurisdiction by the Court to award damages when and if they occur. The court might have to retain jurisdiction forever.

Preliminary to actual appraisal, certain factors disclosed in the evidence relative to the qualities and habiliments of the Pleasanton water system and rights, and affecting their value, must be considered.

1. There is evidence tending to indicate that, in the eyes of a prospective purchaser, the water rights to be appraised would have a lesser value, because overlying lands beyond the limits of the Pleasanton Township Water District are not legally committed to a recognition of the City's priority of appropriative right. However, in the thirty-five year history of the Pleasanton Water System, no serious conflict as to underground water rights has been shown ever to have arisen and therefore this infirmity, if it be such, does not appear to have substantiality.

2. The quantitative extent of the water rights is obviously a factor to be considered by a purchaser. Records indicate with reasonable accuracy, the minimum safe yield from the reservoir. Maximum safe yield, however, is based upon theoretical calculations of plaintiff's witnesses and must be discarded in determining worth to a prospective purchaser, in favor of evidence indicating a *dependable* safe yield of six million gallons daily. The Navy withdrawals of six million gallons daily and the City's chart showing pilot well fluctuations over a period of several years when the Pleasanton System was in full operation (Defendant's Exhibit L), practically demonstrate the dependable safe yield and would be the more certain factor to be considered upon sale.

3. Other factors in evidence which I find to have impact upon market value are: location of the basin and uses to which the waters are or can be devoted.

Evidence bearing upon these foregoing factors has been taken into account in the process of the Court's evaluation.

 Two City expert witnesses valued the subject water rights at $250,000 per million gallons daily; i.e. they appraised the right to take 1 million gallons daily from the basin at the foregoing figure. One City expert testified to a value of $1,-600,000 and another to a value of $1,291,000 per million gallons daily. Thus we have a differential in valuations of $1,350,000 between the lowest and highest appraisals submitted on behalf of the City. It will be sufficient to say that the considerations upon which the appraisals of these four experts severally were based cause the court to accord them no real weight. And this mainly for the reason that these considerations included special "stand-by" value, opinions in other cases, and capitalization upon a percentage basis of present sales prices of water—all improper factors in the instant case.

 Two Government experts valued the water rights respectively at $12,000 and $15,000 per million gallons daily. The witness Bonner who fixed the $12,000 value was in my opinion too low, mainly because he predicated his appraisal upon local agricultural, limited domestic, and industrial use as the "highest and best" use of the water rights. The opinion of the witness Hawley, whose appraisal was $15,000, is more persuasive because based upon knowledge of sales and purchases of water rights and of amounts paid in the acquisition of water rights from agencies using water. In one respect, however, Hawley's figure needs revision upwards. He did not take into account *potential* demand for the water rights by nearby suburban communities for public water supply. I am satisfied that a potential demand by such communities, as disclosed in the evidence, is fairly shown to be reasonably probable. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236.

I have considered and compared the various appraisals, but not for the improper purpose of striking a balance between the lowest and the highest. United States v. Building Known as 651 Brannan Street, San Francisco, D.C., 55 F.Supp. 667. The court also viewed and inspected the entire area of the basin and its environs, as well as the pumping and other installations. It is impossible to make an exact and precise appraisal in this novel and unusual cause. The court has sought to fix the values "on the most accurate basis possible under the circumstances." Anderson v. Mt. Clemens Pottery Co., 66 S.Ct. 1187, 1193.

 My conclusion is that a purchaser under fair market conditions would be willing to pay $25,000 per million gallons daily for the City's water rights, so far as they extend to the taking of the dependable safe yield of the basin (6 million gallons per day) or a total of $150,000. In addition, in view of the probable, though uncertain *potentially* greater safe yield, $5,000 per million gallons daily would be a fair price to be paid for the City's rights so far as they extend to the remaining 9 million gallons daily, or $45,000. This results in an overall total market value of $195,000 and is equal to $13,000 per million gallons daily for the contractual right to take up to 15 million gallons daily.

 But this total market value is not the measure of the City's loss or damage. It is the amount by which this total value has been impaired as a result of the taking. The quality of the City's water rights has necessarily been affected adversely by the taking which has operated to free the condemned parcels of the restrictions of the water right covenants and has resulted in the acquisition by the United States of a prior appropriative right paramount to those of the City. Since the taking, the City's rights lack the same degree of protection in their exercise which existed before the taking. A purchaser must recognize the existence of a real possibility that his user can in the future conflict with diversions on the 4.105 acre parcel under a prior appropriative title validly acquired, to which he must then defer. United States

v. 2,887.37 Acres of Land in Harris County, Tex., D.C., 52 F.Supp. 696; Miller v. United States, 3 Cir., 137 F.2d 592; Eminent Domain, 29 C.J.S., Eminent Domain, § 169, p. 1039. The risk which he thus takes is not based on any fanciful or imaginative factor. There is no satisfactory proof that the safe dependable yield of the basin under existing conditions is actually greater than six million gallons per day. Thus, diversions of 15 million gallons per day under the City's rights might well interfere with diversions on the 4.105 acre parcel under a superior right. Although the Navy appropriations are of indefinite duration, and the appropriative title acquired thereby be lost by non-user, nevertheless the condemned parcels, freed of the covenants which protect the priority of the City's rights in the basin, and equipped with a water supply system capable of producing 2 million gallons of water per day, stand as a continuing threat to the paramountcy of the City's water rights.

 While the possibility of future injury to property is not proper for consideration as a distinct element of damage—as, for example, to the stand-by value of the City's water system—it is, however, a proper factor for consideration as bearing on the question of depreciation in market value.

 The extent of the diminution in value of the City's water rights is not here capable of definite ascertainment. But a proven loss is still compensable although uncertain in amount. Anderson v. Mt. Clemens Pottery Company, supra. The most reasonable method of calculating its extent must be sought. Here, the 4.105 acre parcel has been shown to be capable of yielding an average of approximately 2 million gallons of water per day. We can take this to be the quantitative extent of the prior appropriative title acquired by the United States and the amount by which a purchaser must reckon that the proven dependable yield of the basin to him (6 million gallons daily) may have been or may hereafter be reduced. Having regard to all of the circumstances in evidence, it is my conclusion that a purchaser would reasonably expect a deduction of $26,000 from the fair market value of the City's water rights before the taking, on the theory that the priority of the City's contractual paramount right to take 15 million gallons daily (estimated at $13,000 per million gallons) and its security in such status, has been diminished by 2 million gallons as a result of the taking. Such a diminution in value is not computed on the basis that the United States has condemned any portion of the City's water rights, but rather that a subordination in the quality and value of those rights has occurred as a direct result of the taking in this proceeding of a property right of the City's, with the resulting loss to it of $26,000. Accordingly the award to the City is fixed at the sum of $26,000. Had there been a similar taking of the 100 acre tract, an award could have been made upon at least the same basis as to the yield in gallons from the 100 acre tract.

It is not amiss to comment that had the City, during negotiations prior to the commencement of these proceedings, not been adamant in demanding full metropolitan rates for deliveries to the Navy (Tr. 664), and instead have agreed to lower reasonable rates, it could have received substantial income far in excess of what is now lawfully allowable herein.

 The value of the fee of the 4.105 acre parcel remains to be fixed. In my opinion, the evidence fairly establishes the market value of the fee to be $350 per acre and the value of the house thereon to be $500.

Findings, in accordance with the views herein expressed, may be presented.