## KINCAID v. UNITED STATES et al.

District Court, W. D. Louisiana, Monroe Division.   December 13, 1929.

No. 305.

Sp. Asst. U. S. Atty., of St. Louis, Mo., for respondents.

See, also, 35 F.(2d) 235.

DAWKINS, District Judge. In the former opinion rendered in this case on the motion to dismiss, for the reason that the petition disclosed no cause or right of action, this

Wm: C. Dufour, John St. Paul, Jr., and T. J. Freeman, all of New Orleans, La., Harry H. Russell, of Monroe, La., C. J. Ellis, of Rayville, La., and Streett & Burnside, of Lake Village, Ark., for complainant.

Philip H. Mecom, U. S. Atty., of Shreveport, La., J. O. Modisette, Sp. Asst. U. S. Atty., of Jennings, La., and John C. Dyott, court reviewed the allegations of the bill of complaint at length, 35 F.(2d) 235. The government was dismissed as an unnecessary party, but otherwise the motion was overruled, and the remaining defendants, the Secretary of War, Mississippi River Commission, Chief of Engineers, and subordinate officers thereafter answered, putting at issue the

material allegations of the petition. The case has now been submitted upon its merits.

The record shows that complainant owns 160 acres of land within the Bœuf Basin, between the east guide levees contemplated by the adopted plan for flood control and the hills on the west bank of the Ouachita river. This property, together with the buildings and improvements thereon, is worth under normal conditions about $9,000, and, while the complainant does not reside on it personally, he cultivates about 120 acres thereof, with the assistance of his father and brother. There is attached to this opinion a copy of a map showing the proposed locations of the levee along the Bœuf Basin, from which it will be seen that the property involved lies about midway between the guide levees on the east and the hills on the west, which are from 10 to 12 miles apart. The west guide levee will end just below the city of Monroe, which is some 40 miles northwest of complainant's land, while the one on the east will extend a few miles south of his property. From the end of the east guide levee south to the vicinity of Bayou des Glaises, in Avoyelles parish, the area between the levees on the west bank of the Mississippi river and the hills west of the Ouachita river, except for the high ground of Sicily Island, will be left exposed to the waters of the Bœuf Basin, Bayou Mason, and Tensas river, as well as the backwaters of the Ouachita and Black rivers. There is a ridge or strip of high land, known as "Macon Ridge," which begins in Chicot county, Arkansas, and extends south into and through Louisiana, passing in the vicinity of the town of Delhi, to a point near Sicily Island, in Catahoula parish. This ridge separates the valleys of the Bœuf and Tensas rivers, which converge below the end of Macon Ridge and several miles south of the lower end of the east guide levee. The hills on the west bank of the Ouachita come up to the water's edge in the locality of Harrisonburg, La., and between this point and the south end of Macon Ridge is situated a circular shaped elevation of appreciable area, called Sicily Island, which impedes the outflow from the Bœuf Basin. The result is that, while this basin has an average width of about 15 miles, it spreads out toward the south end to probably 20 miles, but closes in at Sicily Island, with outlets on either side thereof which are only a few miles in width. This condition at present causes backwater to accumulate in the area immediately south of complainant's property, and will continue to do so after construction of the proposed guide levees. When the Mississippi reaches such a stage that the fuse-plug levee just below Arkansas City will break, under the plan, about one-third of the total volume of water passing that point at the time will be turned down the Bœuf floodway and into the area just described.

In a general way, the adopted project, commonly called the "Jadwin Plan," contemplates diverting from the Mississippi river in the vicinity of Cairo, Ill., sufficient water to insure that the main channel will carry the remainder safely to the mouth of the St. Francis river. The water so diverted will be carried through a by-pass or floodway to a point near Helena, Ark., where it will return through the mouth of the St. Francis and join that coming down the main river. From Helena south the levees on the west bank of the Mississippi will be maintained at sufficient height to hold all of this water to a point about 12 miles distant from a similar levee on the south bank of the Arkansas river. Through this gap the White river passes into the Mississippi about midway between the lower end of the levee on its west bank above mentioned and the mouth of the Arkansas. Lying between these levees to the north and west of the 12-mile gap will be located a pool or basin for backwater of some 1,200 square miles, into which will be poured all of the waters of the White and its watershed, as well as the overflow on the north bank of the Arkansas for a distance upstream to the locality of Pine Bluff. It is not contemplated that levees will be built along this stretch of the Arkansas river. When this basin of 1,200 square miles is filled, its outlet, together with all water coming down the White and Arkansas rivers, will be discharged through the 12-mile gap above described. This combined volume will be added to that in the main stream of the Mississippi, which, as previously shown, will consist both of its own waters brought down from Cairo and the quantity which will have returned from the St. Francis Basin at Helena. Then for a few miles the Mississippi, which will have a width between the levees on either side of approximately 4 miles, will carry it all until it reaches the fuse plug levee below Arkansas City.

The expression "fuse plug" was coined, no doubt, because of the fact that, in operation, this stretch of levee will break, or be washed out, when the river reaches a predetermined height of 60½ feet, in similar fashion to what happens when a current of electricity attains a designed voltage sufficient to blow out the fuse in electrical machinery. It simply means that the levees above and below this stretch of about 20 miles will be strength-

ened and raised approximately 3 feet higher than the fuse plug, and when the water in the Mississippi reaches 60½ feet it will begin to flow over. It is contemplated that this will cause a crevasse through the fuse-plug levee, which will gradually widen to include the whole of 20 miles, if the condition of the Mississippi requires. The former Chief of Engineers and author of the project, stated in his examination before the flood control committee of the House of Representatives that the soil of this piece of levee would be softened with sand or otherwise, to be sure that it would break without undue danger to those above and below, although the government's chief hydraulic expert, in his testimony in this case, stated that he did not so understand the purpose.

With a flood at the maximum contemplated by the plan, the quantity of water passing down the Bœuf Basin, it is estimated, will be between 900,000 and 1,250,000 second feet, with the result that complainant's property, as well as all other lands therein, will be submerged. The depth, of course, will vary according to the conditions and stages of water in the Mississippi, the Tensas, Black, and Ouachita rivers at the time, but may reach a maximum of approximately 16.4 feet on the plaintiff's land. In the opinion of some of the engineers, the velocity will not be very great, but will be sufficient to destroy the buildings and improvements in the floodway which are not anchored to the ground. The duration of the water upon these lands will also depend upon conditions prevailing in the lower Mississippi Valley, including the Ouachita, Black, Red, and Atchafalaya rivers, but will probably be from 30 to 60 days. The high waters of the Mississippi and its tributaries usually come in the spring of the year, and the question of whether the lands in this floodway may be cultivated after the waters have passed off will depend upon the time at which the break occurs, as well as the conditions just mentioned. If it should be in the late spring, say about the 1st of May, and the waters should remain for 60 days, it would be somewhere between the 1st and middle of July before the plaintiff and others similarly situated could begin cultivation. By the time their improvements sufficient to enable them to plant were restored, it would be too late in the season to raise anything, except late corn and forage crops, for the staple crop of cotton could not be planted with any reasonable hope of success. It is true that plaintiff and others as far from the fuse-plug levee would have time to move their live stock, household furniture, and farming implements out of the path of the flood; but, of course, the opportunity for fleeing to high ground would diminish in exact proportion to the nearness of the land to the point of the levee's breaking. It is well known that in a large part of the area between the guide levees of the Bœuf Basin, as well as below where the levees end to the Bayou des Glaises section, live stock is allowed to range in the woods and swamps to such extent as would require several days to herd and drive them to safety.

Contrasted with these conditions, with which plaintiff and others within the floodway will have to deal, those fortunate enough to own property behind the levees will be fully protected, including their improvements, live stock, etc., and can pursue their farming and other activities in perfect safety. Those within the floodway will live under a constant menace, for no one can tell in what years meteorlogical conditions will require the use of their lands for the purpose intended by the plan; i. e., a floodway. The government engineers estimate that this will probably not happen more than once in 12 years, while evidence offered on behalf of the plaintiff tends to indicate that in the light of past experience it might occur once in every 4 or 5 years.

However, as pointed out in the former opinion in this case, there is no escape from the proposition that the complainant's property, and that of all others similarly situated, will be, by express design of the plan, compelled to bear the whole burden whenever the necessity arises. The act (May 15, 1928) itself (section 9 [33 USCA § 702i]) specifically makes sections 13, 14, 16, and 17 of the Rivers and Harbors Act of 1899 (33 USCA §§ 407, 408, 411–413) applicable to all lands, waters, easements, and other property and rights acquired or constructed under the provisions of this act (the Flood Control Act), which will prevent any interference with the carrying out of the plan and purposes of the Act of May 15, 1928 (33 USCA §§ 702a–702m, 704). This was done, no doubt, because of the recommendation of the Chief of Engineers, in Document No. 90, referred to as the adopted project, that the federal government should have complete control over these floodways. It is likewise beyond question that all those portions of the valley which have been heretofore subjected to the overflow waters of the Mississippi and its tributaries, which the plan is designed to protect, will be entirely relieved, and the waters which they might otherwise receive, will be carried to the sea, either through the main

channel of the river or through these proposed floodways.

Referring now to the Flood Control Act, in section 4 (33 USCA § 702d) it is provided: "The United States shall provide flowage rights *for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi river.* * * *" (Italics by writer of this opinion.)

■ If the conditions which the carrying out of the plan will produce result in a diversion through the Bœuf Basin floodway of "additional flood waters * * * from the main channel of the Mississippi river," within the meaning of this provision, then clearly the statute requires that the "government shall provide" these "flowage rights," and all question as to how they were to be "provided" was removed by the proviso, which immediately follows: "That in all cases where the execution of the flood control plan herein adopted results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid." That is, they must be acquired by purchase or condemnation as elsewhere provided in the act.

Now, the record shows that during the time preceding 1927, for which there are any reasonable figures, the quantity of water passing down in the vicinity of the proposed fuse-plug levee, into both the Bœuf and Tensas Basins, were as follows: In 1913, 137,732 second feet ; in 1916, 335,814 second feet. What is known as Cypress creek outlet from the Arkansas river was closed by the state of Louisiana, with the consent of the War Department, about 1921, and in 1922, although the waters of that river and the Mississippi reached stages which would have sent them through that point without the levee, none came down these basins. Then, in the flood of 1927, it is estimated that a total of 600,000 second feet flowed through the Bœuf and Tensas basins combined, of which 450,000 second feet went down the former, all of which came from crevasses on the south bank of the Arkansas. Under the proposed plan, the entrance to the Tensas basin at its head is to be closed by the guide levees, and all the waters which will escape through the fuse plug near Arkansas City will be diverted down the Bœuf valley; hence the Tensas area will be fully protected in the future, except from the waters within its own watershed, which will be relatively insignificant. Likewise the quantity that comes down through the Bœuf Basin from its own drainage, when unaffected by overflow waters of the Arkansas and Mississippi, is unimportant. In the past some water from crevasses on the Arkansas have flowed further west into Bayou Bartholomew and down the Ouachita, thus relieving the Bœuf Basin until it returned south of the city of Monroe. In none of these small river basins would there be any occasion for concern from their own waters, except in the lower sections, where the country is affected to some extent by back water from the Ouachita, Black, and Red rivers, or from water entering through crevasses in the Mississippi between the northern end of Macon Ridge and the mouth of Red river.

■ As stated in the former opinion, the Flood Control Act (33 USCA §§ 702a–702m, 704) does not define what is meant by "additional flood waters." But even if we give these words the widest interpretation, without consideration for the fact that the waters to be diverted will be confined to a limited channel, it is proposed, as above shown, under the maximum flood conditions, to discharge from the main stream of the Mississippi through the Bœuf floodway from 900,000 to 1,250,000 second feet of water, whereas it appears, according to the most reliable figures obtainable, not more than 600,000 second feet have ever before passed down the Bœuf and Tensas combined, of which 450,000 second feet went through the former. Unquestionably it would seem, to the extent that the waters which would go through the Tensas, under present conditions, will be diverted through the Bœuf floodway (and it was so conceded by the government's chief expert engineer), this will be a diversion of additional waters.

■ As a result of the examination of the government's chief experts I gather that the contention of the War Department is, because the levees upon the main stream of the river will be raised several feet, and there will be no breaks or crevasses at any point, except those designed for floodways, and the capacity of the Mississippi otherwise will be increased, so that it will carry a greater volume than ever before, there will actually be less water diverted or escaping from the river than has been the case in the past. For this reason they say there will be no diversion of additional waters. However, I cannot conceive that Congress had any such idea in mind when it inserted the provision now under consideration. Besides the estimated 600,000 second feet which came into the Bœuf and Tensas Basins from crevasses in the south bank of the Arkansas river in 1927, at about the same time another occurred on the

east bank of the Mississippi at Mounds Landing, approximately opposite the proposed fuse-plug levee, and through which it is estimated 500,000 feet of water also escaped into the basin of the Yazoo river, in the state of Mississippi. The underlying theory of the adopted plan is that the main channel of the river shall be relieved of its excess waters at flood stage by diverting them through definitely determined channels. This, of course, means that all of the water which has gone out of the Mississippi in past overflows at all points, or at least such as will escape under the improved and strengthened levees of the present plan above what it is deemed safe for the main river to carry, will have to flow through these diversion channels. Certainly, to the extent that the lands in the floodways will receive more water than ever before, if destructive, they will bear a greater burden within the meaning of the act.

It is also contended on behalf of the government that because the Bœuf Basin, prior to the closing of the Cypress creek gap on the south bank of the Arkansas, was overflowed from that source on an average oftener than it is calculated the stages of the Mississippi will blow out the fuse plug, the area to be used for the floodway will actually receive less water, when probable frequency is considered. However, as pointed out heretofore, this stretch of levee on the Arkansas river had already been built and afforded the same protection comparatively as any other major levee on either the Mississippi or Arkansas. I think it also reasonable to say that Congress had in mind the conditions as they existed in 1927, and with which they were dealing in the Act of May 15, 1928 (33 USCA §§ 702a–702m, 704). They were attempting to formulate a comprehensive system as outlined by the Document No. 90, and realized that they were giving full protection to about two-thirds of the area of the Mississippi Valley, which had theretofore been subjected to the menace of overflow under the old system, and that, as a consequence, certain sections of the valley, which were to be devoted to the purpose of spillways, would be compelled to bear the whole burden for the benefit of protected lands.

It seems, also, to be one of the theories of the defense that, inasmuch as the height of the levee to be used as a fuse plug will not be lessened, and the waters of the Mississippi under present conditions would overtop this point when it reached 60½ feet, no protection is being taken away from property owners in the Bœuf valley; hence they should receive no compensation for the use of their

lands to carry the excess water above that height. I do not believe that any such narrow construction is justified by the language of the law, for to the extent which the property of the complainant and others similarly situated will be taken for the purposes of the floodway, to aid navigation of the river and to protect the lands of other persons, the same will be done in the public interest, and to the extent that he and they will be deprived of the unhampered control, possession, and use of their land, just to that extent will their property be confiscated. Of course, so long as their lands, along with those of all other property owners in the Mississippi Valley, were subject to the uncontrolled action of the elements, and were dependent upon the strength or weakness of the constructions upon the main stream of the river, they were in no greater danger and were compelled to bear no heavier burden than any one else.

■ But when the government departed from the policy of building levees and other public works for the purpose of commerce and navigation alone, and expressly entered the field of controlling floods for the protection and reclamation of private lands, then it became engaged in activities which make it responsible for the invasion of private rights. It will not be assumed that Congress intended to violate the Fifth Amendment to the Constitution by taking private property for public purposes without just compensation.

■ There is a universally recognized principle that the owner of property subject to overflow waters of either navigable or non-navigable streams is entitled to have them continue in their natural state "without burden or hindrance imposed by artificial means, and no public easement beyond the natural one can arise without grant or dedication, save by condemnation, with appropriate compensation for the private right." U. S. v. Cress, 243 U. S. 316, 37 S. Ct. 380, 382, 61 L. Ed. 746. This doctrine has had its application usually in cases where the property was situated upon or near the particular stream whose waters were affected by the acts of man; but mere size or magnitude of the condition with which we are dealing cannot alter the principle. All of the property within the range of the overflow of the Mississippi in its natural state, and before construction of levees or other works for confining it to the main channel, was by virtue of its location charged with the burden of receiving those waters at flood time in such manner and to such extent as nature had provided. It is equally well settled, as shown in the pre-

vious opinion in this case, that every one so affected had the right to build levees or dykes along the banks of the stream to keep the water off his own property, without responsibility to those above or below, or on the other side, so long as he did not change or impede its natural course. Therefore, merely because of the fact that these levees, as they were increased in height and extended throughout the length of the Mississippi, were unable to hold the river within its channel at flood stages, did not change the legal situation. The water continued to seek the weakest spot, as expressed by the engineers, and when it was found followed the course of nature, just as in the original state of the river. There was under these circumstances no artificial condition created by which the waters should designedly flow over specific lands. However, in the case before us, the very basis of the plan is that, by strengthening and increasing the height of the existing levees, the excess water shall be diverted over property within the floodways. In other words, the whole scheme is one for artificially controlling the waters of the whole valley, so as to divert them through these channels at flood stage. And this is true, notwithstanding the beneficent purpose for which the project was conceived.

I think it reasonably clear that, when the plan is completed, the property within the floodways can be cultivated in most years, but always, of course, with the knowledge that a flood may come and cause the owners or operators to suffer serious loss. However, these are elements going to the amount or value to be paid for the rights; for the act clearly indicates that the government may acquire, either in fee simple the lands desired, or merely a servitude or right of flowage in those cases where nothing more is needed.

It is admitted that the defendants do not contemplate prosecuting any proceedings for the condemnation of flowage rights through the Bœuf Basin, or that they will endeavor to acquire them amicably from the owners. Under the view they have taken of the law, they could not have followed a different course. It also appears that the surveys and other works of the engineers, including the location of the levees and the proposed construction of the fuse plug at the head of the floodway in Arkansas, has, for the present, at least, affected materially the sale and mortgage value of property between the proposed levees which will be subjected to the flood waters passing through. This may be to some extent a psychological condition, but it seems real enough to those most affected.

The act, in section 4 (33 USCA § 702d), provides that, when the Secretary of War wishes to acquire "any lands, easements, or rights of way * * * needed in carrying out this project," he shall institute proceedings in the United States District Court where the same are situated, if unable to agree with the owners as to price; but, if he desires to take possession and begin work before the issue of value is determined, he may do so upon showing that the money to pay for such lands, easements, or rights of way has been made available to the satisfaction of the court.

Of course, the physical occupancy of the ground in this case will not take place until and when it is overflowed by water in time of flood; but the process of subjecting it to that service and the taking possession, in so far as is either necessary or contemplated by the act, will begin with the construction of the first levee or works which are intended to direct the water upon the land. No other character of possession seems reasonably to have been contemplated in any case where "flowage rights" or rights of way, as distinguished from lands, were to be acquired, than that which flows from the construction of the works. When they will have been completed, the appropriation will be complete. It cannot be that, if the owner is entitled to compensation, he must wait until an overflow comes. Under the law of this state, unqualified ownership of property includes the usus, fructus, and abusus, or the right to possess, enjoy the fruits, and dispose of the whole in the most unrestricted manner. Rev. Civ. Code La. arts. 490, 491. When either of these is taken away or diminished, to that extent does the owner lose a part of his property, or, which is the same, the elements that constitute ownership. See Ambler Realty Co. v. Village of Euclid (D. C.) 297 F. 307; Buchanan v. Warley, 245 U. S. 60, 38 S. Ct. 16, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201; Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L. Ed. 557; United States v. Welch, 217 U. S. 333, 30 S. Ct. 527, 54 L. Ed. 787, 28 L. R. A. (N. S.) 385, 19 Ann. Cas. 680; Boston Chamber of Commerce v. Boston, 217 U. S. 189, 30 S. Ct. 459, 54 L. Ed. 725; Tucker v. U. S. (D. C.) 283 F. 428.

My conclusion is that the act requires the government to pay for the rights which it seeks to exercise over plaintiff's property, and, in so far as the defendants are proceeding without complying therewith, they should be restrained.