Whitakee, Judge,
delivered the opinion of the court:
Plaintiffs in these suits seek to recover just compensation for the taking of the water rights which they claim they had as the owners of land riparian to the San Joaquin Biver or one of its sloughs. This has been done, if at all, by the construction of the Friant Dam on the San Joaquin River upstream from plaintiffs’ lands. The purpose of the construction of this dam is the diversion of the waters of the San Joaquin River from their present course into the Madera Canal and the Friant-Kern Canal. When the pro j ect is completed plaintiffs’ lands will be wholly deprived of the water of the river which they now enjoy to a limited extent. It is for the deprivation of the use of this water that they sue.
1. Defendant defends, first, on the ground that the San Joaquin River is a navigable stream and that the erection of *70 the Friant Dam was to improve navigation and for flood control, and, hence, that it is not liable for the taking of property resulting from its erection.
Defendant says Congress has stated that the “entire Central Valley Project * * * is declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage, and for the delivery of the stored waters thereon, for the reclamation of arid and semiarid lands, and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertaking, and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes.” Since one of the purposes was to improve navigation, defendant says it is immune from liability for the taking of plaintiffs’ water rights as a result of carrying out the plan.
By this declaration Congress did say that a part of the purpose of the Central Valley Project was to improve navigation, although it also said that it had a number of other purposes in mind in the adoption of this plan. However, even though the improvement of navigation was one of the purposes of the over-all plan, the erection of the Friant Dam, of which plaintiffs complain, was [admittedly] * for the sole and only purpose of irrigating arid or semiarid lands, and perhaps also flood control. Instead of improving navigation on the San Joaquin River the erection of this dam destroyed any possibility of navigation on the upper reaches of the river.
The Central Valley of California is about 450 miles long. The northern two-fifths of it is known as the Sacramento Valley, and the southern three-fifths as the San Joaquin Valley. The northern part is drained by the Sacramento River and the southern part by the San Joaquin River. The project contemplated the construction of the Kennett Dam on the Sacramento River, a part of the purpose of which was the improvement of navigation on that river, but this was the only part of the entire project that could be *71 said to have been in aid of navigation. Certainly the erection of the Friant Dam had no relation to the improvement of navigation on either the San Joaquin or the Sacramento River, but had for its purpose the irrigation of certain lands nonriparian to that river. The effect of the erection of this dam was to make the San Joaquin River throughout its course less navigable than it had been before, and for many miles on the upper reaches of the river it converted it into a dry river bed.
When the case of plaintiff, Gerlach Live Stock Company, was before us on demurrer we said (102 C. Cls. 392):
There is nothing in the Acts nor in the documents referred to that negative the allegation of plaintiff’s petition that the purpose of the construction of this dam was solely to irrigate certain nonriparian lands. If this be true, and if the waters of this river have been diverted from plaintiff’s lands, as alleged, there has been a taking under the Fifth Amendment.
The proof now shows without controversy that the purpose of the construction of this dam was to irrigate certain non-riparian lands, and not in aid of navigation. If this is so, defendant is not immune from liability for property taken in carrying out the project. Cf. Kansas v. Colorado, 206 U. S. 46, 85 et seq.; Horstmann Co. v. United States, 257 U. S. 138.
But defendant says that it was a part of defendant’s purpose in the erection of this dam to control floods and that such flood control is within the power granted the Federal Government, for the exercise of which it is not liable in damages. It is true that the erection of the dam was for the purpose of conservation of the water and the prevention of its running down into the sea in times of floods or high waters. However, the purpose of this flood control was not to aid navigation or control commerce, but for the sole purpose of using the water to irrigate arid lands.
The Supreme Court did not hold in United States v. Appalachian Power Co., 311 U. S. 377, that the Federal Government is immune from liability for acts done to control floods where the only purpose of such control was the irrigation of arid lands.
*72 We are of opinion that the defendant is liable for the taking of whatever rights plaintiffs may have had to the water of this river.
2. Plaintiffs claim the rights of riparian owners. The testimony shows that their lands were riparian to the San Joaquin Eiver or some one or more of the sloughs thereof. Defendant’s exhibit 13 and plaintiffs’ exhibit 55 indicate that the lands of plaintiff Potter were riparian to the San Joaquin Eiver, Chamberlain Slough and Mariposa Slough. They also indicate that the lands of Martin Erreca et al. were riparian to the Chamberlain and Mariposa Sloughs and to the San Joaquin Eiver itself, and that the lands of Martin Erreca, sole, were riparian to the San Joaquin Eiver, and that the lands of the Gerlach Live Stock Company were riparian to Deep Slough and certain other unnamed sloughs. Additional evidence in the record, including the testimony of witnesses to the actual overflow of the lands by the waters of the river and these sloughs, leaves no doubt in our minds that they were riparian to the rivers and sloughs except for a small portion of the lands of the Gerlach Live Stock Company. We have found this to be a fact.
Honorable Charles C. Plaines, judge of the Superior Court of the State of California, made findings of fact and conclusions of law on December 31, 1932, and on January 4, 1933, holding that plaintiffs’ lands, among others, were riparian to the San Joaquin Eiver or some one of its sloughs. These findings were in the cases of Miller & Lux, Inc., v. Madera Irrigation District; San Joaquin and Kings River Canal and Irrigation Co. v. Madera Irrigation District, Inc. and San Luis Canal Co. v. Madera Irrigation District, et al. The decrees following these findings are known in the record as the “Haines decrees.” Nothing has happened, so far as the record shows, since these decrees were entered that has materially changed the situation with respect to these lands.
While, of course, in the suits at bar the parties are not bound by these decrees, still they are highly persuasive.
Plaintiffs’ riparian rights, however, were subject to prior appropriative and prescriptive rights of Miller & Lux, Inc., and its subsidiaries, The San Joaquin & Kings Eiver Canal & Irrigation Company, Incorporated, Gravelly Ford Canal *73 Company, Firebaugh Canal Company, Columbia Canal Company, San Luis Canal Company and Santa Eita Irrigation Company, and other upstream diverters. These companies had constructed certain canals through which they had diverted and appropriated large quantities of the water of the San Joaquin Eiver for the irrigation of lands, both riparian and nonriparian, owned by Miller & Lux, Inc., and other persons. In addition, Miller & Lux, Inc., had granted to the Southern California Edison Company and San Joaquin Light & Power Corporation the right to construct dams and reservoirs above the site of Friant Dam for the production of electric power. Plaintiffs’ water rights were subject to these prior rights. The result was that plaintiffs’ lands benefited only from the flood waters of the river.
However, notwithstanding these superior rights, there was left in times of high water sufficient additional water to overflow the lands of the plaintiffs or, by seepage, to raise the water level underneath their lands. The result was that by overflows and by seepage the lands of the plaintiffs were moistened and enriched and made more productive. The erection of the Friant Dam took these rights from plaintiffs. Plaintiffs’ light to compensation is limited to their rights to have their lands moistened and enriched in these times of high water.
The defendant contends that the overflow of these lands did not in fact enrich them, but we think the evidence is to the contrary.
3. When the defendant decided upon the erection of the Friant Dam and the extinguishment of the riparian water rights of riparian owners downstream, it entered into contracts with Miller & Lux, Inc., and its subsidiaries, who diverted water for irrigation of the lands of others, and who also owned large acreages both riparian and nonriparian to the San Joaquin and its sloughs which were suitable for the raising of crops, and also certain grasslands which were watered by controlled irrigation, and grasslands which were not watered by controlled irrigation, but which were subject to overflow or seepage in times of high water. The contracts guaranteed to Miller & Lux the same amount of water they had previously enjoyed for the irrigation of their crop lands *74 and controlled grasslands. The rights of their uncontrolled grasslands to the excess water in times of high water were, however, to be appropriated by the defendant and paid for by it.
The parties agreed on a price of $9.00 an acre as the difference in the market value of the uncontrolled grasslands before and after the taking of these water rights. The total amount agreed to be paid for all such rights was $2,450,000. Miller & Lux, however, had sold to plaintiffs, and perhaps others, certain portions of their lands, and it was questioned whether a part of the sum to be paid might not properly be payable to the grantees rather than to Miller & Lux, and so, it was agreed that $511,350.00 of the total sum should be placed in escrow, and should be used to reimburse the defendant for any judgments that might be recovered by the grantees of Miller & Lux, or their successors, for the deprivation of the riparian water rights appurtenant to these lands, limited, however, to $9.00 an acre for the uncontrolled grasslands. The balance was to be paid to Miller & Lux.
(a) The uncertainty as to whether or not Miller & Lux or the grantees were entitled to recover for the deprivation of the water rights appurtenant to the lands conveyed was due to reservations contained in the deeds to these lands from Miller & Lux. These reservations differ in their terms. The reservation to plaintiff Potter reads in part as follows:
The conveyance is made subject to the following conditions, covenants, and reservations:
(1) To all existing water rights of the Grantor and its subsidiary companies * * * whether established by appropriation, prescription, or existing contract, and the right of the Southern California Edison Company, Ltd., and the San Joaquin Light & Power Company to store the water of the San Joaquin Eiver under existing contracts with the Grantor.
(2) To the right of Grantor and said subsidiary companies to sell and convey any water right already established in it to them, by appropriation or prescription, in or to the waters of the San Joaquin Eiver or its tributaries * * * and to store and/or change the place of use of such water, whether within or without the watershed of said river, and such right of storage of such water, the right to which has already been established *75 by appropriation or prescription, and/or change of place of its use, may be exercised by any purchaser or assignee of said water rights.
Inasmuch as the deed to Potter was subject only to the “existing water rights” of Miller & Lux, and they did not have the right to store water at Friant Dam, it seems plain that plaintiff Potter, and not Miller & Lux, is entitled to recover from the defendant the value of the water rights appurtenant to the Potter lands, of which he was deprived by the erection of the Friant Dam.
This seems all the more clear since Miller & Lux at first offered to plaintiff Potter a deed, rejected by Potter, reading in part as follows:
Excepting and reserving the following property and property rights:
$£ $ $ $
(d) It is expressly understood and agreed that Grantor reserves the right to store and impound at any point or points above the land herein conveyed all or any part of the water flowing in the San Joaquin River, or any of its tributaries; Grantor also reserves the right to take and divert at any point or points above the land herein conveyed all or any part of the waters of said River and its tributaries, * * * and thereafter use such waters for the irrigation of riparian or nonriparian lands within or without the water shed of said river and whether or not owned by Grantor, and for the production of hydroelectric power.
The rights herein reserved may be transferred to and exercised by the United States of America, the State of California, or any of their or either of their agencies. * * *.
Under such a reservation Miller & Lux would probably have had the right to transfer to defendant the right to subordinate the Potter lands to such storage and diversion, but this proposal was rejected by plaintiff Potter and a deed reserving only existing water rights was agreed upon. Such existing water rights did not include the right to impound water at Friant Dam and to deprive lower riparian land owners of their rights to water during freshets and floods.
(b) The deed to a part of the Martin Erreca et al. lands contained a reservation reading in part as follows:
*76 The land above described is riparian to Mariposa Slough, and purchaser shall have a right to make a reasonable use as a riparian owner and in common with lower riparian land (including that of seller’s) of any water which may at any time be actually flowing in said Slough as the same passes said above-described land. It is expressly understood and agreed, however, that the seller reserves the right to store, impound, divert and use all or any part of the waters of the San Joaquin River and its tributaries * * * at any point or points above the land herein agreed to be conveyed and use the same for the irrigation of riparian or nonriparian lands, and/or for production of hydroelectric power. The rights herein reserved may be transferred to and exercised by any public district, private or mutual water company, firm, or individual, to which seller may transfer or assign said rights.
The reservation in the deeds to the remainder of the lands conveyed to these plaintiffs was to the same effect, except that the seller reserved the right to store, impound, and divert the waters of the San Joaquin River for the irrigation of riparian or nonriparian lands, whether or not such lands were within the water shed of said river. The reservation also expressly provided that the rights might be conveyed to the United States of America, in addition to the other persons named in the reservation above quoted.
Plaintiffs Martin Erreca et al. insist that it was intended by these reservations to reserve only such rights as Miller & Lux had at the time the deeds were executed.
At the time the deeds were executed Miller & Lux had acquired the right to divert at points above the land conveyed and to use a part of the waters of the San Joaquin River and to use these waters for the irrigation of riparian and non-riparian lands, and they evidently intended to retain these rights notwithstanding the conveyance to plaintiffs Martin Erreca et al. But the reservation went further than this. It not only reserved the right to divert the water which they had already been diverting, but they further reserved the right to “store, impound, divert and use all or any part of the waters of the San Joaquin River * *
The concluding sentence of the reservation, not quoted above, reads:
*77 These reserved rights shall constitute an easement in said lands so agreed to be conveyed and the riparian rights thereto.
It would seem, therefore, that Miller & Lux, Inc., intended to do something more than merely reserve their existing rights. Prior to the reservation Miller & Lux had the right to divert water from the stream, but it did not have the right to store and impound it.
Before the execution of this deed they had the right to divert something like 1,450,000 acre-feet of water out of a total of something like 1,811,000 acre-feet, which seems to have been close to the annual average flow of the river. They had not, however, acquired the right to divert the excess of something like 350,000 acre-feet; but in the deed they reserved, as against the grantee, the right to appropriate “all or any part” of the waters of the river, and it was provided that the rights so reserved should be an easement on the land conveyed and the riparian rights thereof; that is to say, the riparian rights in the lands conveyed should be exercised in subordination to the right of Miller & Lux to appropriate the balance of the water of the river, not only the water already appropriated, but, in addition, “all” the water of the river.
The condition of the deed reads, the grantor “reserves” the right. This word means to keep or retain; that is to say, to keep what one already has. You do not- reserve a right which you do not possess. However, when we take into consideration that the reservation went beyond the existing rights of Miller & Lux and that it provided that the rights reserved should be an easement on the lands conveyed and the riparian rights thereto, we think it must be concluded that the grantor had in mind not only retaining the rights it had already acquired, but also the right, as against the grantee, to appropriate additional water in the river — “all” the water.
(c) The reservations in the deed to Martin Erreca, sole, and to the Gerlach Live Stock Company are identical in their terms. They read in part:
*78 'Excepting and reserving the following property and property rights:
’!• Í* •!• <]> *}•
This conveyance is made on condition that the riparian rights of the land herein conveyed shall always remain and be exercised subject and subordinate to the water rights of the Grantor * * * whether such water rights be riparian, appropriative, or prescriptive, to the end that the Grantor * * * may use, enjoy, and transfer said water rights, including tie right to contract for or permit storage on the upper reaches of the San Joaquin River, without let or hindrance from the Grantee, his heirs, and assigns. This covenant and conditions shall not be construed as an extinguishment of the riparian rights of the land herein conveyed, but as an estoppel in favor of the Grantor, * * * against the Grantee, his heirs and assigns, to the extent herein provided.
By this exception it was plainly intended to reserve to the grantor its existing water rights. Whether or not they intended to go further than this depends upon the proper construction to be given the clause reading: “including the right to contract for or permit storage on the upper reaches of the San Joaquin River, without let or hindrance from the grantee, his heirs, and assigns.”
Prior to the execution of this deed Miller & Lux had granted to two hydroelectric companies the right to store water on the upper reaches of the San Joaquin River for the purpose of generating electricity. A part of the purpose of the reservation was no doubt to convey the lands subject to the right granted these companies. The language is also susceptible of the construction that the grantor intended also to reserve the right to enter into such contracts in the future. But we do not think it is necessary to determine whether or not the parties had in mind future contracts as well. Whether or not the parties had in mind future contracts, nevertheless the extent of the reservation was “to contract for or permit storage on the upper reaches of the San Joaquin River.” The right was not reserved to contract or to permit diversion of the waters of the river, as had been done in the reservation in the deed to the lands in Martin Erreca, et al.
*79 What the United States has done that has caused the damage to plaintiffs’ land is the diversion of the waters. It may be that under the reservation in the foregoing deed and under the contracts between defendant and Miller & Lux defendant is protected from liability for the storage of the waters of the San Joaquin Biver, but there is nothing in the deed which permits it to completely divert the water from plaintiffs’ lands. This is the thing that causes the decrease value of the lands.
The reservation expressly says that it “shall not be construed as an extinguishment of the riparian rights of the land herein conveyed, but as an estoppel in favor of the Grantor * * In other words, grantee was estopped to complain of the fact that the grantor had entered into a contract to permit storage of the water; but he was not estopped to complain of the diversion of the waters from his lands. This right to the flow of the water he had as a riparian owner and the contract recites that riparian rights are not extinguished.
For the taking of this right by defendant we think plaintiffs Martin Erreca and Gerlach Live Stock Company, as well as plaintiff Potter, are entitled to recover; but We are of opinion that under the reservations in the deed in the case of Martin Erreca et al. plaintiffs are not entitled to recover.
Miller & Lux, Inc., has filed an intervening petition contesting the right of plaintiffs to recover, but it does not seek a judgment against the defendant and, hence, we do not consider whether or not it is_ entitled to judgment.
4. Defendant further says that plaintiffs have no right to recover because plaintiffs could not use the flood waters of the river without wasting them, and that such use .was prohibited by the amendment to the California Constitution adopted in 1928. This amendment, being article XIV, section 3, reads as follows:
It is hereby declared that because of the conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation. *80 of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to .water or to the use or flow of water in or from any natural stream or water course in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Eiparian rights in a stream or water course attach to, but to no more than so much óf the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses: Provided, however, That nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained.
Defendant says that this article of the California Constitution preserves in a riparian owner the right to use the waters of the stream to which his lands are riparian, but only to the extent that he can beneficially use them and without unnecessary waste of them. It says that plaintiffs cannot use the flood .waters of the San Joaquin Eiver without wasting them, and that since they are prohibited from wasting them, and they cannot use them without doing so, they have lost all their right to them.
Plaintiffs do not admit that their present use of these waters is wasteful; they say it is not wasteful to allow them to flow over their lands and then on to the lower riparian lands, before finally reaching the sea. They say that such a use of them benefits the lower riparian lands, and, in addition to this, they say the flood waters retard the encroachment of the salt water on the lands in the delta of the San Joaquin and Sacramento Eivers, and so benefits those lands. They further say that prior to the passage of the Constitutional Amendment they had a vested right for these waters to flo.w over their lands and that it was not intended to take these *81 rights away from them. They say that one who would interfere with the customary use by a riparian owner must provide some physical solution to enable him to continue to receive his water and that he has no right to divert it and appropriate it without doing so.
It seems clear that the amendment to the California Constitution does not go as far as the defendant claims. The California cases hold that the mere fact that as the result of rainstorms and resulting floods, or of melting snows, or of natural flow otherwise, a large volume of water flows on to the sea, unused, wasted, and lost, does not permit a subsequent appropriator to disregard the rights of riparian owners, prior appropriators and overlying' landowners to allot the waters of the stream which they can put to reasonably beneficial use under reasonable methods of use. If under these circumstances one seeks to appropriate the water wasted or not put to any beneficial use, it is obligatory that he find some physical solution, at his expense, to preserve existing prior rights, or if this cannot be done, and the water is to be appropriated, nonetheless, under the right of eminent domain, the riparian owners, prior appropriators and overlying landowners must be compensated for the value of the rights taken. Peabody v. City of Vallejo, 2 Cal. (2d) 351, 40 P. (2d) 486; City of Lodi v. East Bay Municipal Utility District, 7 Cal. (2d) 316, 60 P. (2d) 439; Hillside Water Co. v. City of Los Angeles, 10 Cal. (2d) 677, 76 P. (2d) 681; City of Los Angeles v. Aitken, 10 Cal. App. (2d) 460, 52 P. (2d) 585; Los Angeles Flood Control District v. Abbot, 24 Cal. App. (2d) 728, 76 P. (2d) 188.
It would appear that plaintiffs were not deprived of all of their rights as riparian owners by the amendment to the California Constitution. Apparently, they had the right to demand that defendant provide such a physical solution as would permit them to continue to receive so much of the waters of San Joaquin Eiver as they could beneficially use; or, if such a solution was impossible, that they had the right to demand of the defendant compensation for the deprivation of the right to so much of the water they had formerly received as they could beneficially use.
*82 The defendant by its acts bas recognized that the owners of these lands were entitled to some use of the waters of this river. On July 27, 1939, it entered into a contract with-Miller & Lux, the former owner of plaintiffs’ lands, under which the defendant agreed to pay to Miller & Lux $9.00 an acre in compensation for the taking of the water rights appurtenant to their uncontrolled grasslands which were riparian to the San Joaquin River and the sloughs thereof, including plaintiffs’ lands. There was no determination as to what these water rights were, but it was recognized by this agreement that Miller & Lux did have some water rights on account of their ownership of these lands, and in order to compensate them for the taking of these rights the defendant agreed to pay them $9.00 an acre, a portion of the amount to be placed in escrow to be paid to whatever person might be entitled thereto.
This was a recognition on the part of defendant that plaintiffs’ rights were worth at least this much. It has actually placed the money in escrow for the rightful claimant and it certainly cannot complain at a judgment for that amount.
Plaintiffs, of course, are not limited to a recovery of this amount if they have been able to show that the value of their lands has declined a greater amount, but we do not think, they have done so. On all the evidence we are convinced that this represents just compensation. Miller & Lux and defendant thought so, and we think they were right. We discuss this more fully hereinafter.
5. Be all this as it may, defendant says that at any rate it has not as yet taken any rights from plaintiffs. It says they are still receiving all the water they ever got and that although, it may some day take substantially all the water, it has not as yet done so.
It is true that plaintiffs are still getting all the water they ever got because defendant’s project has not yet advanced to the stage where their water has been cut off. It is also true that on October 20,1941, all the water in the river was being lawfully diverted by owners of prior appropriative and prescriptive rights at points above plaintiffs’ lands. It is also true that during the period from October 20 to November 11, 1941, the flow would not, even in the absence of any *83 artificial interference, have been high enough to have flooded plaintiffs’ lands.
Plaintiffs, however, say that it is immaterial whether on October 20, 1941, the flow, if not interrupted by the defendant, would have been sufficient to reach and water the lands of plaintiffs after satisfying prior appropriation and prescriptive rights. They say that defendant had announced its intention to take all the water of - the river, had entered upon and gone far forward with works designed to accomplish that end, had actually wholly interrupted the flow, except for an amount sufficient to satisfy the prior ap-propriative and prescriptive rights, and had permanently-impounded 17,000 acre-feet of water in the 23-day period commencing October 20,1941, and that this fixes October 20, 1941, as the date of taking.
As the dam was being constructed defendant left three openings in it at 316 feet above sea level, which is approximately the normal level of the river, through which the water was permitted to flow. One after the other these openings were closed, the last one on October 20,1941. . When this last one was closed, all the water, except for enough to supply prior appropriative and prescriptive rights, was shut off from lower riparian owners until the pool behind the dam reached elevation 375 feet. At this elevation there were provided permanent openings in the dam through which the water could be released to control the elevation of the pool. These openings were supposed to have in them what is known as needle valves, which when closed retain the water in the pool, but which when opened permit the water to escape. Above this level, at elevation 446, it was intended to divert the water in the pool into the Madera Canal, and finally at elevation 464 feet there was an opening through which it was intended to divert the water into the Friant-Kern Canal.
On November 11, 1941, the water reached elevation 375, which was the permanent opening in the dam for the release of the waters in the pool; but the defendant had been unable to secure the needle valves for insertion in this opening to prevent the escape of waters in the pool; hence, after the water in the pool reached this height, it flowed down the bed of the river uncontrolled. The defendant did not secure these *84 valves until sometime in 1944, and in the meantime, except for the brief period while the water was rising from elevation 316 to elevation 375, plaintiffs continued to receive as much water as they had ever received. Based on these facts defendant says it did not take plaintiffs’ water rights on October 20, 1941, the date on which the temporary openings were closed. This is the issue presented.
• The Supreme Court has not as yet definitely settled the question as to the time when a taking occurs through the erection of a dam. In the most recent case to come before that tribunal, United States v. Dickinson, 331 U. S. 745, the court held that a landowner might wait until his land had been actually flooded before bringing his action and that the statute of limitations did not begin to run against him until that time, but it said :
We are not called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens.
Plaintiff in Kincaid v. United States, 37 F. (2) 602, alleged that the United States had taken his lands by the adoption of the Mississippi River Flood Control Act of May 15, 1928, and by the advertising for bids for the construction of certain guide levees bounding the Boeuf Flood-way. The Mississippi River Flood Control Act of 1928 had adopted what was known as the Jadwin Plan for the control of floods on the Mississippi River. This plan, among other things, called for the Boeuf Floodway, through which in times of extreme high water the river would be allowed to flow. It also provided for the erection of guide levees on each side of this floodway in order to retain the waters therein. The lands of the plaintiff in that suit lay within this floodway and he sued to enjoin the defendant from carrying out the plan without first condemning and paying him for his lands.
The District Court held (37 F. (2d) 602) that although the physical occupancy of the land within this floodway did not occur until the land had been overflowed in time of flood, still “the process or subjecting it to that service and the *85 taking possession, insofar as is either necessary or contemplated by the act, will begin with the construction of the first levee or works which are intended to direct the water upon the land.” Since it held that these acts were threatened and that it thought the plaintiff was without an adequate remedy at law, it enjoined the defendant from proceeding with the construction of the floodway. The Circuit Court of Appeals affirmed (49 F. (2d) 768).
The Supreme Court granted certiorari. In its opinion in 285 U. S. 95, reported sub-nom. Hurley v. Kincaid, on pages 103 and 104, it said:
* * * We may assume that, as charged, the mere adoption by Congress of a plan of flood control which involves an intentional, additional, occasional flooding of complainant’s land constitutes a taking of it — as soon as the Government begins to carry out the project authorized. Compare United States v. Lynah, 188 U. S. 445, 469; United States v. Cress, 243 U. S. 316, 328; Peabody v. United States, 231 U. S. 530, 538; Portsmouth Harbor Land & Hotel Co. v. United States, 250 U. S. 1; 260 U. S. 327, 329.
But it held that since, in its opinion, the plaintiff had an adequate remedy at law for the taking, if one had occurred, he was not entitled to the injunction he sought and, hence, it dismissed plaintiff’s bill.
In Sponenbarger v. United States, 308 U. S. 256, plaintiff asserted that the lands within this floodway had been taken merely by the adoption by Congress of the plan contemplating the erection of this floodway. The Court, however, pointed out that the Act of Congress adopting this plan prohibited the doing of anything to carry it out, other than the building of levees, until further surveys had been made and until it had been determined whether or not the additional measures provided for, including the Boeuf Floodway, were advisable. It also pointed out that after these surveys had been made the Boeuf Floodway had in fact been abandoned. Under these facts the court held that there had been no taking of plaintiff’s property, reversing the opinion of the Circuit Court of Appeals holding that there had been a taking.
*86 In the cases of Peabody v. United States, 231 U. S. 530, and Portsmouth Harbor Land & Hotel Co. v. United States, 250 U. S. 1; and 260 U. S. 327, there was not involved the question of when the taking had occurred, but whether or not •there had been a taking at all; but, what was said in those cases sheds some light on the question of the time a taking actually, occurs.
Plaintiffs, in Portsmouth Harbor Land & Hotel Co. v. United States, 260 U. S. 327, alleged that the Government had installed a battery and a fire control tower on lands to the rear of plaintiffs’ lands, and that the guns from this battery could be fired only over plaintiffs’ lands, and it was alleged that the defendant intended to do so at will. The court said:
* * * If the United States, with the admitted intent to fire across the claimants’ land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete. But even when the intent thus to make use of the claimants’ property is not admitted, while a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove it. Every successive trespass adds to the force of the evidence. The establishment of a fire control is an indication of an abiding purpose.
We think the reasoning behind this decision furnishes a guide for the determination of the time of the taking. That time, it would seem, comes whenever the defendant’s intent to take has been definitely asserted and it begins to carry out that intent. So long as it is conjectural whether or not defendant will actually take plaintiff’s property, a taking has not occurred, but when conjecture ripens into a definitely asserted purpose and steps are taken to carry out that purpose, the taking may be said to have occurred.
In the case at bar there can be no doubt that the defendant intended to deprive plaintiffs of whatever water rights they had in their lands. This is evidenced by a number of things. The construction of the dam, which would result in the deprivation of plaintiffs’ rights, had been begun on November *87 3, 1939, a considerable time prior to October 20, 1941. In the 23 days following that date a considerable body of water had been impounded in the pool behind the dam, and construction was continuing insofar as materials could be obtained.
Not only that, but defendant had paid for many of the rights they intended to take. They had entered into an agreement with Miller & Lux to pay them something like two and a half million dollars for the taking of water rights, some of which were appurtenant to lands riparian to this river, including plaintiffs’ lands. There can be no doubt on the record that defendant’s intention to take plaintiffs’ rights had been clearly demonstrated and that it was in the process of carrying out that intention.
We have no doubt that a taking had occurred not later than October 20, 1941. Certainly by that time defendant had brought about a decrease in the value of plaintiffs’ lands. With the imminent prospect of their being deprived of any further rights to the flood waters of this river, they could not have sold them for their former value.
We hold that the taking of plaintiffs’ water rights occurred not later than October 20,1941.
6. There remains only the question as to the valuation to be put on these water rights, or, otherwise stated, the difference in the value of the lands with and without the rights.
The Commissioner has found that plaintiff Potter is entitled to recover a sum which represents compensation at the rate of $9.00 per acre. This seems to us correct. The Bureau of Reclamation in the United States Department of Interior appointed a board of surveyors to appraise the lands with and without these water rights. They found that the difference in value was $9.00 per acre. The State of California also appointed a similar board. It found a difference of $8.75 an acre. Miller & Lux, Inc., which owned tens of thousands of acres of land riparian to this river, agreed with the defendant on $9.00 an acre. Plaintiff Potter himself testified the difference in value was between $10.00 and $15.00 an acre.
*88 ■ ¡A. decline in the market value of the Potter lands of $9.00 an acre is well supported by the. evidence.
The Commissioner has found that the value of Martin Erreca’s-land was decreased by the sum of $2,500.00.-. Defendant does not except to the amount found, if plaintiff had. any rights at all and if the defendant took them. We think this amount represents just compensation.
We have found the. difference in value of the lands of - the Gerlach Live Stock Company to be $10,440.00. This is at $9.00 per acre, except for a part of the acreage of this company which the evidence shows was not benefited by the waters of the river. The defendant excepts to this on the same grounds as stated above. For the reasons stated, we do not think the exception is well taken. We are of opinion that compensation of $10,440.00 is just.
Judgments will be rendered against the defendant in favor of plaintiffs, as follows: in favor of plaintiff.J. Sheldon Potter, in- the sum of- $54,343.26; in favor of Martin Erreca in the sum' of $2,500.00; and in favor of Gerlach Live Stock Company in the sum of $10,440.00. On each of the judgments compensation for delay in payment will be computed at four per cent per annum from October 20, 1941, to date of payment. This will' be added to the amount of the judgment ib. each case. The petition of Martin Erreca et al: is dismissed.
The defendant on January 6, 1945, filed a motion to require the Southern California Edison Company, Ltd., and the San Joaquin Light and Power Corporation to appear and defend any interest they or either of them had in the litigation. Appearances by said companies were filed in due course. • Since it appears that the interests of said companies are in no wise adverse to those of the plaintiffs or to those of-the defendant, the action is dismissed as to them. It is so ordered.
Howell, Judge; Madden, Judge; LittletoN, Judge; and Jones, Chief Justice, concur.

Amended June 1, 1948.