**HIGHLAND PARK, Inc.,**

v.

**UNITED STATES.**

**No. 375-55.**

United States Court of Claims
May 7, 1958.

O. R. McGuire, Washington, D. C., and B. H. Levy, Savannah, Ga., for plaintiff.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

WHITAKER, Judge.

This is a suit for just compensation for the alleged taking of plaintiff's property resulting from the flight of heavy airplanes over its land.

In February 1951 McIntosh & Company, Inc., purchased a 75½-acre tract of land about a mile east of Hunter Field, an airport on the outskirts of Savannah, Georgia, for the purpose of subdividing it for residential use. In December 1951 McIntosh & Company organized plaintiff corporation, to which it deeded the property in February 1952.

In 1950 the United States acquired Hunter Field from the City of Savannah for use as a military airfield. Before that it had been used as a municipal airport. There were three runways on it, one running northeast-southwest, another northwest-southeast, each about 5,000 feet in length, and a third, running roughly east and west, and somewhat shorter than the other two. Between 1947 and 1949 the northeast-southwest runway was extended 2,000 feet, making it 7,000 feet long. This runway was used almost exclusively by the heavier planes. The east-west runway, only about 5,000 feet long, was used by heavy planes only in exceptional circumstances, when there were unusually high winds.

In February 1952, the defendant completed a new east-west runway, 10,500 feet in length. Its eastern end was 5,500 feet from plaintiff's property. In May 1952, the use of the other runways was discontinued and all flights from then on used only the new east-west runway. The center of this runway, if extended, would run along the northern boundary of plaintiff's property, with the result that from 85 to 90 percent of plaintiff's property lies within the eastern approach zone to this runway, as plotted by the defendant.

Prior to December 31, 1953, propeller driven airplanes, using the east-west runway, passed over plaintiff's property at altitudes from 200 to 1,200 feet and higher. However, these flights did not seriously interfere with plaintiff's use and

enjoyment of its property. However, on December 31, 1953, the first of some 90 six-engine B–47 Stratojet Bombers arrived, and others followed at a rate of approximately 15 a month, replacing the propeller driven planes, formerly using the airfield. These jet bombers flew over plaintiff's property at a lower altitude than the propeller driven planes had.[1] They made a greater and more piercing noise, and caused much greater vibration than the propeller driven planes had. They flew over plaintiff's property at the rate of from 30 to 60 a day. When they passed over the property, all conversation had to cease, radio and television reception was disrupted, the windows in the houses shook, dishes rattled on the shelves, sleep was disrupted, and the noise was so great as to be painful to the ears of some of the residents. Some were in a constant state of anxiety, and even had to undergo medical care for nervous disorders, said to have been induced by anxiety over the passage over their homes of these jets.

McIntosh & Company had purchased the property in order to subdivide it into building lots for sale as medium cost homesites. The property, known as Highland Park, was divided in the middle by a county drainage canal.[2] The property to the east of this canal had been developed by the construction of streets and sewers, gas, water, and electric lines. In the eastern half there were 76 lots.

From July 1952 until April 1955 plaintiff disposed of 48 of the 76 lots in the eastern half. On these 48 lots sold, 43 houses were constructed. Of the 48 lots sold, 15 were sold in 1952, 25 in 1953, 6 in 1954, and 2 in 1955. No lots have been sold since April 1955, and no houses have been constructed since that time.

Subsequent to April 1955 no private lending institution in the Savannah area was willing to finance the sale of any property or the construction of a home in the Highland Park subdivision. One real estate mortgage correspondent, who had made 37 out of a total of 41 mortgage loans on the Highland Park property, refused in the spring of 1954 to make any further loans in the subdivision, and in April 1955 the Veterans Administration refused to make an appraisal of property in the subdivision, as a preliminary to guaranteeing a loan on it, because "the property lies too close to the runway zone of Hunter Air Force Base." The Veterans Administration Technical Bulletin, TB–4A–121, forbade appraisals of property within a runway zone, and gave "special consideration" to property within an approach zone.

In April 1951 McIntosh & Company gave to the local Board of Education a five-acre plot in the eastern half of Highland Park, conditioned on the building of a grammar school thereon. In January 1952 the commanding officer at Hunter Field asked the county authorities to construct an access road to the school from Hunter Field. However, on May 20, 1952, even before the advent of the B–47 Stratojet Bombers, the commanding officer of Hunter Field wrote the Board of Education as follows:

"Respectfully, your attention is invited to the new East-West runway system in operation at this Base. I feel that the construction of a school near the approach zone of a runway undesirable. The two sites, as located on the inclosed map, are near the take-off and approach zone to this runway system.

"Since present and future aircraft flying from this runway system will produce noises of variable intensity, we feel the noise level will be an impediment to classroom instruction and recitation. The normal operation of aircraft does not present a

---

1. The glide angle for the jets was 100 feet above the ground at the western boundary of plaintiff's property, rising to 150 feet at the eastern boundary. The glide angle means the lowest permissible flight, consistent with safety.

2. A plat of the property, filed with county authorities, and filed as plaintiff's exhibit 8–B, shows this ditch to be 60 feet wide, but, as actually constructed, it was much narrower."

danger, however, it is recognized that an emergency can and may develop which could become hazardous."

Thereafter, this property was returned to McIntosh & Company by the Board of Education, and by it deeded to the plaintiff.

Defendant, of course, does not deny that it has taken an easement in the air space over plaintiff's property, and it must be concluded from the foregoing that the passage of these planes over plaintiff's property seriously impaired its value for residential purposes.

█ It follows, therefore, under the holding of this court in Causby v. United States, 60 F.Supp. 751, 104 Ct.Cl. 342; 75 F.Supp. 262, 109 Ct.Cl. 768, and the holding of the Supreme Court in United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, that the defendant is liable for just compensation for the taking of the easement, and the resulting damage to the remainder of the property.

█ The first question is the date of the taking of an easement. Of course, if defendant had already taken an easement before plaintiff acquired the property, plaintiff would not be entitled to recover. Defendant says an easement was taken immediately after its acquisition of Hunter Field and when its planes began to fly over it, which was before plaintiff acquired the property. We do not think this is so.

As the Supreme Court said in Causby v. United States, supra, the air space over the land is a part of the public domain, which may be used by airplanes with impunity so long as the flights do not substantially interfere with the use and enjoyment of the surface of the ground. The proof here shows that flights of propeller driven planes over plaintiff's property did not substantially interfere with the use and enjoyment thereof. While these planes were flying over the property plaintiff sold 40 out of 76 lots

in the eastern half of the subdivision. It was not until the arrival of the jet bombers, beginning on December 31, 1953, that plaintiff's use and enjoyment of its property was seriously interfered with.[3] After that time plaintiff was able to sell only 8 lots; 6 in 1954, and 2 in 1955. We think the taking occurred when the first jet bomber flew over plaintiff's property, with the intent on the part of the defendant to continue to fly them over it at will. Portsmouth Harbor, Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287; Gerlach Live Stock Co. v. United States, 76 F.Supp. 87, 111 Ct.Cl. 1, 86, affirmed 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231. The findings show that the defendant intended to base 90 B–47 Stratojet Bombers at this base, and to fly them over plaintiff's property constantly. We think the taking occurred on December 31, 1953.

█ The difficult question in the case is what is just compensation. McIntosh & Company purchased the land in February 1951 for $35,000. They conveyed it to plaintiff, which was organized by McIntosh & Company in order to handle the sale of the lots, in February 1952, for $38,500, the increase of $3,500 representing the engineering and surveying costs expended by McIntosh to the date of the transfer to plaintiff.

As stated above, the property was divided in two by a county drainage canal. There were 76 lots in the fully developed eastern half, of which plaintiff had sold 48, leaving 28 lots unsold. The part of the property to the west of the drainage ditch was wholly undeveloped, but plaintiff had platted it into 108 lots, but had not staked these out in the ground.

The trial commissioner has found that the 136 unsold lots, both in the eastern and western halves, would have had a value on December 31, 1953, of $20.00 a front foot, except for the passage over them of these jet bombers. There were

---

3. The glide angle of the six-engine jets was approximately 100 feet lower than the minimum altitude of which the four-engine propeller-driven planes passed over the property.

11,801 front feet in the 136 lots. At $20.00 a front foot, he finds a total value of $236,000 as of December 31, 1953. From this amount he deducts $60,000 as the estimated cost of constructing roads and other facilities in the western half, and finds a value as of December 31, 1953, of $176,000. He also finds that they have a value of $20,600 under the actual conditions existing, that is, with the jet bombers flying over them.

However, he concludes in his opinion that the date of the taking was April 12, 1955, and that the lots should be valued as of that date. He finds that on that date the lots would have had a value of $22.50 a front foot, in the absence of aircraft flights, or a net total of $205,522.50. On this basis he finds that the net value of the property taken, after deducting a residual value of $20,600, is $184,922.50 as of April 12, 1955.

This residual value of the property of $20,600, he finds, is the amount a speculator might pay for it, on the theory that the Government might abandon the use of Hunter Field as a jet bomber base. So long as it is used as a jet bomber base, the plaintiff's property has no value at all for residential purposes.

It cannot be denied that the value of the lots for the use plaintiff contemplated to make of them has been destroyed. Plaintiff sold the 48 lots in the eastern half with certain restrictive covenants, which no doubt makes it impossible for it to sell the remaining lots for other than residential purposes and, on the basis of the proof, we agree with the trial commissioner that they had a residual value of no more than $20,600.

So far as the 28 lots on the eastern half are concerned, plaintiff's appraisers appraised them at $20.00 a front foot and above. Defendant's appraisers appraised them, one at about $14.84 a front foot, and another at about $21.35 a front foot. We think a valuation of $20.00 a front foot is proper. These 28 lots had a total front footage of 2,426 feet. At $20.00 a front foot, this gives a total of $48,520.

However, the projected lots in the western half of the property cannot be valued on the same basis as the unsold lots in the eastern half. The western half, as stated, was wholly undeveloped. It was in its original wild state, with trees, laden with vines and Spanish moss, standing on it, and covered with underbrush. It had not been drained, and it was not then known whether or not it could be drained sufficiently for the construction of septic tanks on it, which was the only means of taking care of sewage. It was in the same state it was in when McIntosh & Company purchased it.

It was not accessible from the eastern half. It was cut off therefrom by a drainage canal. It was accessible only from White Bluff Road on the west, and through unpaved dirt streets running through Avalon, a low cost, unrestricted development immediately adjoining it on the west.

When plaintiff purchased it, it no doubt thought it could develop this western half and sell lots therein for approximately the same price as the eastern half. Yet, it must be remembered that the former owners of the property had been willing to sell both the eastern and western halves for $35,000. The acreage in the western half was considerably more than one-half of the total acreage. There were 76 lots in the eastern half, and 108 projected lots in the western half. The front footage of the lots in the eastern half was 2426; and 9,375 in the western half. Plaintiff paid for the western half more than one-half of the purchase price of $38,500. On the basis of the acreage in the two halves, plaintiff paid approximately $24,500 for the western half. Allowing plaintiff a profit of 50 percent for this western half, it would be entitled to recover for the taking of it the amount of $36,750. We have said it was entitled to recover for the eastern half $48,520, making a total of $85,270. From this there is to be deducted, however, the residual value, referred to above, of $20,600, leaving a net amount of $64,570.

We think a judgment for $65,000 represents just compensation. Judgment for this amount will be entered, together with interest thereon, as part of just compensation, at the rate of 4 percent per annum from December 31, 1953 to date of payment.

Defendant is vested with a perpetual easement of flight over plaintiff's property at an elevation of 100 feet or more above the ground, with airplanes of any character.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, *Judges, concur.*